UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald SACCO, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald J. NOTO, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Hugh C. HENDERSON, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald CELLE, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James B. MARTIN, Defendant-Appellant.

Nos. 72-1985 to 72-1989.

United States Court of Appeals,
Ninth Circuit.

Jan. 30, 1974.

See also D.C., 337 F.Supp. 521.

Jerrold M. Ladar (argued), San Francisco, Cal., for appellants.

James L. Browning, Jr., U. S. Atty., San Francisco, Cal., Stephen H. Scott, Special Atty., Organized Crime & Racketeering Section U. S. Dept. of Justice, Marshall T. Golding (argued), Atty., Appeals Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for appellees.

Merle H. Jenkins, Bakersfield, Cal. (argued), for appellant Hugh C. Henderson.

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN and WALLACE, Circuit Judges.*

CHOY, Circuit Judge:

Sacco, Noto, Henderson, Celle and Martin were convicted after a non-jury trial of conducting an illegal gambling business in violation of 18 U.S.C. § 1955 and of being principals to a crime (18 U.S.C. § 2). Sacco and Noto were each fined $5,000 and sentenced to three years imprisonment. Celle and Martin were fined $500 and $200 respectively and each sentenced to three years probation. Henderson was fined $2000 and sentenced to three years probation.

Appellants raised three principal contentions on this appeal. First, they challenge the constitutionality of 18 U. S.C. § 1955 on the following grounds: (1) § 1955 is an impermissible exercise by Congress of its powers under the commerce clause of the United States Constitution; (2) § 1955 is unconstitutionally vague; and (3) § 1955 cannot be uniformly applied nationwide. Second, they contend that lower level participants in a gambling enterprise cannot be reckoned to satisfy the "five or more persons" requirement of § 1955. Third, Henderson challenges the nature and sufficiency of the evidence against him. We affirm.

---

* The Honorable Joseph T. Sneed, U.S. Circuit Judge, who qualified for office on September 11, 1973, took no part in the consideration or decision of this case.

## FACTS

Sacco and Noto were the proprietors of a bookmaking operation which involved wagering on horse races, football games and basketball games in violation of § 337a of the California Penal Code. Celle and Martin were "splitters." A splitter collects bets, calls them in to the bookmaker's phoneman, then pays successful bettors and collects from the losers. For their services, splitters are paid a percentage of the net profits and normally bear the same percentage of any losses. Henderson was a "layoff bettor," a bookmaker who places bets with another bookmaker to protect himself against excessive losses.[1]

The key government witness, testifying under a grant of immunity, was Asbury, who had acted as phoneman for the Sacco-Noto operation during the thirty-two day indictment period: December 31, 1970 to January 31, 1971. Asbury testified that $256,832 in gross wagers was received by the operation during the indictment period.[2] Of this amount, $114,832 was wagered on daily horse races and sports, $62,000 on the Dallas-San Francisco NFL playoff game, and $80,000 on four other NFL playoff games and the holiday bowl games. Asbury's records indicated that Henderson placed seven layoff wagers totalling $6,570 with Noto between January 20 and January 27, 1971 and received one layoff bet from Noto.

■ 18 U.S.C. § 1955 was enacted as Part C of Title VIII of the Organized Crime Control Act of 1970, 84 Stat. 937.[3] The legislation was aimed at curtailing syndicated gambling, the lifeline of organized crime, which provides billions of dollars each year to oil its diversified machinery.[4] The statute requires that three elements be established to constitute an offense: there must be a gambling operation which (1) is a violation of the law of a State or political subdivision in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

The trial court found there was an illegal gambling business in violation of

---

1. In sports events, a layoff bet is to keep a bookmaker's books balanced when more wagers are received on one side of a contest than another. In horse races, where the odds are long, and a bookmaker does not want to bear the total risk of loss, part of the bets are "laid off" with another bookmaker. (Reporter's Trancript at 322–23).

2. Representative days of the indictment period reveal that a net profit in excess of $2,000 was obtained on three occasions. Gross wagers in excess of $2,000 were received on nineteen occasions.

| | In | Out | Net |
|---|---|---|---|
| January 8, 1971 | $3,956 | $1,414 | $2,532 |
| January 26, 1971 | $7,102 | $3,836 | $3,266 |
| January 27, 1971 | $7,145 | $4,373 | $2,772 |

3. 18 U.S.C. § 1955 reads in pertinent part: Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such businesses; and

(iii) has been or remains in substantially continuing operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, book making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

4. See 115 Cong.Rec. 10735 (1969) (Remarks of Senator Hruska); 116 Cong.Rec. 590–1 (1970) (Remarks of Senator McClellan); 116 Cong.Rec. 603 (1970) (Remarks of Senator Allott).

California law that satisfied the statutory amount requirement of § 1955. This is not contested on appeal.

## CONSTITUTIONAL CHALLENGE

### 1. *The Commerce Clause*

Appellants contend that 18 U.S.C. § 1955 regulates purely local activity and that there has been no demonstration of an effect on interstate commerce to justify regulation under the commerce clause. U.S.Const. art. I, § 8. We disagree.

■ Chief Justice Marshall in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), held that the commerce power extended to intrastate activity which affected other states. *Id.* at 195. This view is reflected in recent Supreme Court decisions. Though an activity be local and not regarded as commerce, it may be reached by Congress "if it exerts a substantial economic effect on interstate commerce. . . ." *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942). *Accord: Perez v. United States,* 402 U.S. 146, 151–152, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Maryland v. Wirtz,* 392 U.S. 183, 189, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); *Katzenbach v. McClung,* 379 U.S. 294, 302, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

■ Congress can declare that an entire class of activities affects commerce. If that finding is challenged, "the only function of courts is to determine whether the particular activity regulated is within the reach of the federal power." *United States v. Darby,* 312 U.S. 100, 120, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941). *Accord: Wirtz, supra* at 192 of 392 U.S., 88 S.Ct. 2017. The Court utilizes a "rational basis" test, first formulated in *Heart of Atlanta,* to scrutinize a statute grounded on the commerce clause. Two questions are asked by a court: (1) did Congress have a rational basis for finding that the regulated activity affected commerce, and (2) if it had such a basis, were the means selected to regulate reasonable and appropriate. *Heart of Atlanta, supra* at 258–259 of 379 U.S., 85 S.Ct. 348.

■ If the class of activities is within the reach of the federal power and the regulation imposed is reasonable, a court's investigation is concluded. There is no need for inquiry on a case-by-case basis or proof that a particular activity had an effect on commerce. *Perez, supra* at 152 of 402 U.S., 91 S.Ct. 1357; *Katzenbach, supra* at 302–304 of 379 U.S., 85 S.Ct. 377. Nor can courts "excise, as trivial, individual instances" of the class. *Wirtz, supra* at 193 of 392 U.S., 88 S.Ct. 2017.

Legislative history reveals that Congress had a rational basis for finding that the illegal gambling proscribed by § 1955 affected interstate commerce. Congress determined that organized crime posed a major threat to American society and that illegal gambling operations provided organized crime with its greatest source of revenue. Congress made the following special findings regarding the effect of illegal gambling operations on interstate commerce:[5]

> The Congress finds that (1) illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof; (2) illegal gambling is dependent upon facilities of interstate commerce for such purposes as obtaining odds, making and accepting bets, and laying off bets; (3) money derived from or used in illegal gambling moves in interstate commerce or is handled through the facilities thereof; (4) paraphernalia for use in illegal gambling moves in interstate commerce; and (5) illegal gambling enterprises are facilitated by the corruption and bribery of State and local officials or employees responsible for the execution or enforcement of criminal laws.

5. S.Rep.No.91–617, 91st Cong., 1st Sess. 16 (1969), [hereinafter cited as Senate Report].

It was also found that organized crime had developed complex channels through which ostensibly local gambling operations sent their revenues to central coffers.[6] The illicit operations were seen to distort the production of goods for commerce and the flow of goods in interstate commerce.[7]

Congress had a rational basis for limiting the class of activities proscribed by § 1955. There were two principal reasons for classifying a thirty-day or $2,000 daily gambling operation as affecting interstate commerce. First, local law enforcement was to be left intact to fulfill its traditional role. § 1955 was not intended to preempt local efforts, but to free local government to do its job by removing corruption and adding the resources of the federal government.[8] The arguments against the expansion of federal jurisdiction into traditionally local areas were strongly voiced during the hearings before both the House and Senate Committees.[9] These arguments were rejected because of the singular importance of the problem and the inability of both federal and state authorities to deal with it.[10] Second, the inherent monetary and manpower limitations on the federal government demanded selectivity, hence only major gambling enterpris-es could be pursued. Indeed, Congress specifically excluded sporadic gambling and those operations of insignificant monetary proportions.[11] The "iceberg" dimension of illegal gambling was perceived and Congress anticipated that operations which met the minimum standards of § 1955 would ordinarily involve activities of considerable greater magnitude.[12]

██ The absence of particularized findings on which the thirty-day or $2,000 minimum for § 1955 were based does not render the statute unconstitutional.[13] Congress need not make particularized findings for each point of a program of legislation. Mr. Justice Douglas in *Perez, supra* at 156 of 402 U.S., 91 S.Ct. 1357, stated that Congress need not make any particularized findings in order to legislate. There may be rare instances where a gambling operation meeting the requirements of § 1955 will be a purely local operation, in no way connected with organized crime. That possibility does not undermine the statute's constitutionality, for such rarity is precisely what Mr. Justice Holmes had in mind when he said: "when it is necessary in order to prevent an evil to make a law embrace more than the precise thing to be prevented, it [Congress] may do so."

6. President's Comm'n on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 189 (1967). *See also* Task Force Report: Crime and its Impact—an Assessment 52–53 (1967).

7. 116 Cong.Rec. 604 (1970) (Remarks of Senator Allott). Senator Allott cites numerous examples to demonstrate the dependency of substantial gambling operations on interstate commerce. *See also* 116 Cong. Rec. 35199 (1970) (Remarks of Congressman St. Germain).

8. Senate Report at 71, 74; Hearings on S. 30 Before the Subcom. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 91st Cong., 1st Sess., at 381, 383, 394 (1969) [hereinafter cited as Senate Hearings].

9. Senate Hearings at 425; Hearings on S. 30 Before the Subcomm. # 5 of the House Comm. on the Judiciary, 91st Cong., 2nd Sess., at 498–499 (1970) [hereinafter cited as House Hearings].

10. Federal authorities found it difficult to satisfy the interstate commerce element. Senate Report at 72; Senate Hearings at 383. Many local authorities were infected with corruption. House Hearings at 105, 168.

11. 1970 U. S. Code Cong. & Ad. News p. 4029.

12. Senate Report at 73; Senate Hearings at 381; 116 Cong.Rec. 603 (1970) (Remarks of Senator Allott).

13. One passage in the Senate Hearings, though not a specific finding of Congress, is evidence of the basis for the thirty-day or $2,000 minimum. Deputy Assistant Attorney General Petersen explained that in previous federally-conducted gambling raids, federal agents had been able "to come up with better than $2,000 a day in most all of [the] cases." Senate Hearings at 399–400.

Westfall v. United States, 274 U.S. 256, 259, 47 S.Ct. 629, 71 L.Ed. 1036 (1927). We hold that Congress had a rational basis for finding that the illegal gambling proscribed by § 1955 affected interstate commerce. We note that a number of other circuits have reached the same conclusion.[14]

The means chosen by Congress were reasonable and appropriate. The goal was to reach large-scale operations that were "so continuous and so substantial as to be of national concern."[15] As noted above, local efforts were not to be preempted. A federal-state joint venture, with federal prosecution of large scale gambling operations affecting interstate commerce, was intended to preserve the delicate federal-state balance in prosecuting criminal activity ostensibly confined to one state.

### 2. Vagueness

Appellants argue that § 1955 is unconstitutionally vague because it lacks standards and is uncertain. They contend that the terms "gross revenue," "involves" and "conducts" are ambiguous. We find that the terminology used, a discernible legislative intent and the construction given § 1955 by other circuits refute appellants' argument.

■ The Supreme Court specified what it demanded of a new statute and how assertions of vagueness would be resolved in Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926):

> That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled

rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

When a statute is challenged, the court first looks to the well-settled meaning of the words or phrases utilized. The rules of statutory construction are then employed to enable a court to ". . . look through awkward or clumsy expression, or language wanting in precision, to the intent of the legislature." Id. at 394, 46 S.Ct. at 128. Finally, decisions in the same jurisdiction are examined.

■ Appellants argue that "gross revenue" refers to the net profits of a syndicated gambling operation while the government maintains the term means gross receipts. The distinction between "gross" and "net" is well established in the business world. When Congress referred to "gross revenue," it meant the total amount wagered in one day. Legislative history is in accord.[16] Congress' aim was to eliminate major gambling enterprises, regardless of the luck of the odds. United States v. Ceraso, 467 F.2d 653 (3rd Cir. 1972). The facts of this case reveal that the statutory amount requirement was satisfied under either the government's or appellants' definition of "gross revenue."

■ The word "involves" is defined by appellants as "to draw in as a participant." This is an acceptable definition and any allegations as to its vagueness are frivolous.

■ The term "conducts" does not have such a precise meaning that we can summarily dismiss appellants' contentions. The intent of Congress is difficult to divine since the word is nowhere defined in the history of § 1955. How-

14. United States v. Ceraso, 467 F.2d 653 (3rd Cir. 1972); United States v. Becker, 461 F.2d 230 (2nd Cir. 1972); United States v. Harris, 460 F.2d 1041 (5th Cir. 1972); Schneider v. United States, 459 F.2d 540 (8th Cir. 1972).

15. 1970 United States Code Congressional and Administrative News at 4029.

16. 115 Cong.Rec. 10736 (1969) (Remarks of Senator Hruska).

ever, 18 U.S.C. § 1511 [17] and § 1955 were enacted together as sections 802 and 803 of the Organized Crime Control Act of 1970. The same language is utilized in both statutes to define an "illegal gambling business." The statutes should be construed together. United States v. Becker, 461 F.2d 230, 232 (2nd Cir. 1972). With reference to the "illegal gambling business" in § 1511, the Congress stated: [18]

> The section applies generally to persons who *participate* in the ownership, management, or conduct of an illegal gambling business. The term "conducts" refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet. (emphasis added.)

The word "participate" is the key to resolving the controversy. The original bill introduced by Senator Hruska contained the word "participate" instead of the six words which presently mark the violation. Other circuits which have construed "conduct" have revived this initial meaning.[19]

■■ The outstanding testimonial is the facts of the case before us. Sacco and Noto relied on the splitters, Celle and Martin, to perform the essential tasks of their gambling operation: seek out bettors, pay winners, and collect from losers. The splitters depended upon the financial backing of Sacco and Noto for their existence. The layoff bettor, Henderson, also played a vital role in the economics of the Sacco-Noto operation. Through layoff bettors, a crucial task is accomplished: allocation of the risk of loss.[20] Managers, split-

---

17. 18 U.S.C. § 1511 reads in pertinent part:
§ 1511. Obstruction of State or local law enforcement
(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—
(1) one or more of such persons does any act to effect the object of such a conspiracy;
(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and
(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.
(b) As used in this section—
(1) "illegal gambling business" means a gambling business which
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and

conducting lotteries, policy, bolita or numbers games, or selling chances therein.
(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
*See also* 1970 United States Code Congressional and Administrative News at p. 4030. There the provisions of § 1955 are said to parallel those of § 1511.

18. 1970 United States Code Congressional and Administrative News at 4029.

19. United States v. Ceraso, *supra*; United States v. Palmer, 465 F.2d 697, 699 (6th Cir. 1972); United States v. Becker, *supra*; United States v. Riehl, 460 F.2d 454 (3rd Cir. 1972).

20. President's Comm'n on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 189 (1967), reads as follows:
Organization is also necessary to prevent severe losses. More money may be bet on one horse or one number with a small operator than he could pay off if that horse or that number should win. The operator will have to hedge by betting some money himself on that horse or that number. This so-called "layoff" betting is accomplished through a network of local, regional, and national layoff men, who take bets from gambling operations.

ters and layoff bettors are indispensable to the maintenance of an illegal gambling business. This is precisely the type of illegal interrelationship Congress intended to eliminate by the enactment of § 1955. Each person, whatever his function, who plays an integral part in the maintenance of illegal gambling, conducts an "illegal gambling business" and is included within the scope of § 1955. The sole exception is the player or bettor.

We hold § 1955 not unconstitutionally vague.

3. *Uniformity.*

■ Appellants contend that because § 1955 relies on a violation of state law for one of its elements, the effect of the statute will not be uniform throughout the United States. This aspect of § 1955 does not render it unconstitutional. Congress can enact statutes which incorporate by reference the present and future laws of the various states. United States v. Sharpnack, 355 U.S. 286, 293, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). In *Sharpnack*, the Court held the Assimilative Crimes Act of 1948, which made subsequently enacted state law applicable to federal enclaves within the respective states, constitutional as a reasonable exercise of congressional power. Accord, Schneider v. United States, 459 F.2d 540 (8th Cir. 1972).

■ When Congress exercises its power under the commerce clause, there is no requirement of national uniformity "such as there is with respect to the power to lay duties, imposts and excises." Currin v. Wallace, 306 U.S. 1, 14, 59 S.Ct. 379, 386, 83 L.Ed. 441 (1939). *Accord:* Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 616, 70 S.Ct. 403, 94 L.Ed.2d 381 (1950); Clark Distilling Co. v. Western Md. Ry. Co., 242 U.S. 311, 327, 37 S.Ct. 180, 61 L.Ed. 326 (1917). The fact that § 1955 applies only in states where gambling is illegal does not result in a denial of equality under the law guaranteed by the due process clause of the fifth amendment. Turf Center, Inc. v. United States, 325 F.2d 793, 796 (9th Cir. 1963). The absence of national uniformity does not render § 1955 unconstitutional.

## FIVE OR MORE PERSONS REQUIREMENT

■ Appellants' second contention is grounded on the theory that Celle, Martin and Henderson were independent operators and cannot be reckoned to satisfy the "five or more persons" requirement of § 1955. They argue that the government evidence revealed one three-man business comprised of Sacco, Noto and Asbury, and a number of one-man businesses. In our disposal of appellants' vagueness argument, the indispensable nature of the relationships among management, splitter and layoff bettor, coupled with legislative history, led us to hold that each appellant conducts the subject illegal gambling business. Congress intended to include lower level participants within the scope of § 1955. We reject appellants' contention.

## SUFFICIENCY OF EVIDENCE

■ Much of the evidence establishing Henderson as a layoff bettor and revealing that he wagered $6,570 between January 20 and 27, 1971, was provided by Asbury, a participant in the Sacco-Noto operation. For the most part, Asbury's testimony was uncorroborated. Under California law, the uncorroborated testimony of an accomplice is insufficient to convict. California Penal Code § 1111. Henderson claims that California rules of evidence are applicable in a federal prosecution under § 1955. This is incorrect. While Congress did adopt a particular substantive statute (anti-gambling) of the state, Congress did not incorporate into § 1955 the procedural rules of the state where the illegal activity occurred. Evidence questions in a federal court are federal questions. Smayda v. United States, 352 F.2d 251, 253 (9th Cir. 1965), cert. denied, 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966). The testimony of an

accomplice need not be corroborated, but merely examined with care. United States v. Sidman, 470 F.2d 1158 (9th Cir. 1972).

 Viewing the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we hold that Henderson's wagers of $6,570 in one week coupled with Asbury's testimony, is sufficient evidence to sustain his conviction as a layoff bettor.

Affirmed.

HUFSTEDLER, Circuit Judge (specially concurring):

I concur in the majority's conclusion that 18 U.S.C. § 1955 survives the constitutional attacks upon it in these cases. For the reasons expressed in Judge Ely's dissenting opinion, the statute is ill designed to serve Congress' announced purposes. The statute is unwise, but it is not unconstitutional because the commerce clause delegates enough power to Congress to enact the legislation. The statute requires proof of facts which Congress has determined are adequate to establish the essential interstate nexus (18 U.S.C. § 1955(b)(1)). The evidence upon which Congress concluded that the combination of ingredients embodied in section 1955(b)(1) would affect interstate commerce is no more persuasive to me than it is to Judge Ely. If I had been a congressional fact finder, I would have rejected it. But we are not the finders of fact, and I cannot say that the evidence credited by Congress was so hopelessly flimsy that Congress could not rationally have relied upon it to support its determination of the interstate impact of the forbidden activity.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The appeal in these cases were originally heard by Circuit Judges Trask and Choy and District Judge James M. Burns, then sitting with our court by designation. At about the same time, other consolidated appeals, United States v. Oberpriller, et al., Nos. 72–1663, 72–1723, 72–1436, 72–1659, 72–1461 were being considered by Circuit Judges Wright and me, along with Senior United States District Judge Talbot Smith of Detroit, Michigan who, like Judge Burns, had regularly been assigned for duty with our court. Both of the appeals involved, as a threshold question, the constitutionality of 18 U.S.C. § 1955. The panel in the present case arrived at the conclusion that the statute withstood the constitutional challenge, whereas the judges originally concerned with *Oberpriller* reached the opposite conclusion. It therefore became necessary that both of the consolidated appeals be withdrawn from the original panels to which they had been assigned and rescheduled for the resolution of the constitutional question by the full court. Since it is contemplated that all questions in *Oberpriller,* save the constitutional question, shall be returned to the original *Oberpriller* panel, my present dissent is directed only to that portion of the majority opinion in the subject appeal which upholds the constitutionality of 18 U.S.C. § 1955.

My first objection to the statute in question is that it is intolerably discriminatory and thus denies to some, including the appellants, the equal protection of the law. By its express terms, the criminal sanctions of the statute may be applied only to those citizens who commit their alleged unlawful gambling activities in communities wherein gambling is already prohibited by local law. I think we can properly take judicial notice of the fact that gambling is not illegal in the State of Nevada. I also know that there are many communities in the State of California wherein, by local option, certain types of gambling do not constitute an illegal activity, and it is not unlikely that the same is true in many local areas of the United States.

None of the Supreme Court cases cited by the majority supports the proposition that national uniformity is not required whenever a federal crime is being

created, absent any element of interstate action. Currin v. Wallace, 306 U.S. 1, 14, 59 S.Ct. 379, 83 L.Ed. 441 (1939), Secretary of Agriculture v. Roig Refining Co., 338 U.S. 604, 616, 70 S.Ct. 403, 94 L.Ed. 381 (1950), and Clark Distilling Co. v. Western Md. Ry. Co.,[1] 242 U.S. 311, 327, 37 S.Ct. 180, 61 L.Ed. 326 (1917), all dealt with economic regulations, not federal penal statutes. United States v. Sharpnack, 355 U.S. 286, 293, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), is not applicable, as it does not purport to create, *sui generis*, a new federal crime. It does no more than to permit the application of state penal law within federal enclaves, and unlike the anti-gambling statute in our present case, the statute upheld in Perez v. United States, 402 U. S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1972), made loan-sharking a federal crime without including a violation of state law as one of its elements.

On the other hand, we here have a national criminal statute which cannot, in fact, be given uniform national application. This rather unique circumstance, in and of itself, should require that the statute, together with its underpinnings, be scrutinized with the utmost care. It was never intended, I think, that the Congress, in the enactment of criminal statutes, should intrude into matters which were, and should have been, properly reserved to the states. This is especially true, I submit, in respect to acts which all the states have the power to proscribe, as well as the capability of enforcing the proscription. In the words of Mr. Justice Douglas, if what the Congress has done in enacting 18 U.S.C. § 1995 "can be done, then the National Government could devour the essentials of state sovereignty as attested by the Tenth Amendment." Maryland v. Wirtz, 392 U.S. 183, at 204, 88 S.Ct. 2017, at 2028, 28 L.Ed.2d 686 (1967) (dissenting opinion).

The anti-gambling statute here involved, which represents the metamorphosis of the commerce power into a general federal police power, is unlike other federal criminal statutes which have been held constitutional as legitimate exercises of the commerce power. The statute in this case does not include, as an element of the offense, a direct connection with interstate commerce. Nor does the statute criminalize an activity which is uniquely within the province of organized crime, as does the anti-loansharking statute upheld in Perez v. United States, 402 U.S. 146, 91 S. Ct. 1357, 28 L.Ed.2d 686 (1972).

The original proposed opinion in *Oberpriller*, written by the Honorable Talbot Smith, is so scholarly in its composition and so precisely logical in its reasoning that I cannot, I think, strengthen it significantly by any words of my own. With Judge Smith's approval, I am therefore adopting the pertinent portion of his writing in *Oberpriller* as the expression of my own views. This reads:

The act before us [1a] upon which conviction was had, contains no requirement that the proscribed activities employ or affect the channels of interstate commerce. Rather, there is a Congressional finding[2] "that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof."

---

1. In *Clark, supra,* the Court upheld the Webb-Kenyon Act, holding that the Congress' power to regulate interstate commerce in intoxicants included the power to subject such movement to state prohibitions. Turf Center Inc. v. United States, 325 F.2d 793 (9th Cir. 1963), which upheld a similar anti-gambling statute, 18 U.S.C. § 1952, erroneously relied upon *Clark, supra,* for a broad holding that federal legislation under the commerce clause does not violate due process "merely because of a variation in state laws." *Id.* at 796. Since *Clark, supra,* did not deal with the issue of imposing federal penal sanctions, I submit that the *Turf Center* court's reliance on *Clark* was clearly mistaken and that, hence, *Turf Center* was incorrectly decided.

1a. See note 25 hereof.

2. Sec. 801, Organized Crime Control Act of 1970, P.L. 91–452, 84 Stat. 922.

We are thus remitted to a consideration of the Commerce clause.[3] Despite early vacillations as to its content and application it has today emerged as a sort of superclause of the Constitution.[4] Few areas of our modern life have escaped its application, from agriculture to civil rights. It would serve no useful purpose to trace its ever-broadening scope on a case by case basis, from United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) involving the Fair Labor Standards Act of 1938, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), Agricultural Adjustment Act of 1938, Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), involving Title II of the Civil Rights Act of 1964, and Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) in which the petitioner sought an injunction restraining enforcement of Title II of the Civil Rights Act of 1964, to Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), wherein injunction was sought to restrain the enforcement of the Fair Labor Standards Act of 1938. Gunther and Dowling[5] put the matter well when they pointed out that:

[T]he modern pressures for national action on a widening range of problems have prompted increasingly intense searches for constitutional justifications among the enumerated powers. And in these searches, the commerce clause has proved to be a frequently attractive and often hospitable base for the assertion of regulatory authority.

The result of the holdings above cited is that virtually all business and commercial activity in the country is subject to federal control under the commerce clause. The interrelation of businesses in this country makes such result inevitable, applying the standards now employed in interpreting the clause.[6] It would be difficult indeed to envision even a purely local commercial activity which could not be held to contribute in some way to a class of activities affecting interstate commerce.[7] Wickard v. Filburn, supra. There thus seems to be no significant limitation on federal power over economic problems, unless it be found in the standard of reasonableness enunciated in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

It remains to be seen whether the commerce clause will take over, with the same ubiquity, the traditional criminal jurisdiction.[8] If so, we are moving towards far-reaching changes not only in our criminal law but in our federalism.

3. U.S.Const. art. I, § 8. The clause provides in part: "The Congress shall have Power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ."

4. In this general area, the growing power of the commerce clause, there has been an outpouring of comment by legal scholars. See Stern, The Scope of the Phrase Interstate Commerce, 41 A.B.A.J. 823 (1955); Cramton, The Supreme Court and the Decline of State Power, 2 J.Law & Econ. 179 (1959); Alfange, Congressional Power and Constitutional Limitation, 18 J.Pub.L. 103 (1969); Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn.L.Rev. 432 (1941); Fordham, The States in the Federal System—Vital Role or Limbo? 49 Va.L.R. 666 (1963) Kauper's Cases and Materials on Constitutional Law, 4th Ed. 1972, pp. 119–191 contains an exhaustive survey of and bibliography on the subject.

5. Cases and Materials on Constitutional Law (1970), p. 235.

6. Compare Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) and N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) with Heart of Atlanta Motel, Inc. v. United States, supra.

7. See Bogen, The Hunting of the Shark: An Inquiry Into the Limits of Congressional Power Under the Commerce Clause, 8 Wake Forest L.Rev. 187 (1972); Stern, supra, note 4.

8. We recognize, of course, that regulatory statutes may contain penalty provisions but we are here considering a statute directed against criminal activity as such.

A recent comment in the University of Illinois Law Forum [9] states a tentative prognosis in these terms:

"The expansive reading given this [commerce] clause by the judiciary has allowed the federal govrnment, in relatively recent times, to inject itself deep into the field of crime control. Still, it is as yet not clear whether the commerce power may be expanded in the area of crime control to the extent that it has been broadened in the economic arena. If this were to occur, then for all practical purposes the only issues to be litigated in the future would be those of statutory interpretation. The scope of federal criminal law, more than ever before, would be a political question to be determined by the President and Congress and would be limited primarily by philosophical-political concepts of the role of the federal government in the criminal area."

Historically, the Congress has moved slowly in this area.[10] It is ancient learning that it is within the province of a state to define crimes and fix the punishment therefor, Cox v. Maxwell, 366 F.2d 765 (6th Cir. 1966), and, of course, it is clear not only that the national government is one of enumerated powers only, but that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." [11]

Nevertheless the commerce clause has been utilized, as well, in the criminal area, but heretofore to a limited degree and with limited application. Although Title 18 of the United States Code is re-

plete with federal criminal statutes they have required, substantially, either that the crime employ some instrumentality of interstate commerce or that it directly affect interstate commerce.[12] The federal law came into operation only when a connection was shown between the proscribed activity and interstate commerce.

Such was, generally speaking, the situation prior to the passage of the Act here under consideration and those related in purpose, namely, an insistence by the Courts, in accordance with the language of the statutes, that the interstate link required by the statute actually be shown for conviction under the federal law. The Act under consideration, the constitutionality of which has been challenged, has no such requirement.

Against a background of mounting crime in this country, with public fear and indignation resulting therefrom, President Johnson, on July 23, 1965, appointed a Commission on Law Enforcement and Administration of Justice.

Among the findings of the Commission so appointed was a Chapter on "Organized Crime" (hereafter Commission Report).[13] This study depicted "a society that seeks to operate outside the control of the American people and their governments. It involves thousands of criminals, working within structures as complex as those of any large corporation, subject to laws more rigidly enforced than those of legitimate governments." [14] It went on to point out that "much of the money organized crime accumulates comes from innumerable petty transactions: 50-cent bets, $3-a-month private garbage collection

9. Resch,—Federal Criminal Jurisdiction, 1972 U.Ill.L.F. 805 (1972).

10. See Cushman, The National Police Power Under the Commerce Clause, 3 Minn.L.R. 289 (1919); Scope of Power to Regulate Crime under the Commerce Clause, 32 Mich.L.R. 378 (1934).

11. U.S.Const. Amend. X.

12. See, e. g., 18 U.S.C. § 660 (embezzlement from corporation engaged in interstate car-

riage); 18 U.S.C. § 1084 (interstate transmission of wagering information); 18 U.S.C. § 1951 (interference with commerce by threats or violence); 18 U.S.C. § 1952 (traveling in interstate commerce or using interstate channels to aid in racketeering enterprises).

13. "The Challenge of Crime in a Free Society," a Report by the President's Commission on Law Enforcement, Chapter 7.

14. *Id.*, p. 187.

services, quarters dropped into racketeer-owned juke boxes, or small price rises resulting from protection rackets."[15] Gambling, in fact, was pinpointed as the greatest source of revenue for organized crime, with loan sharking as the second largest source.[16] It was pointed out, naming specifically "the Mafia," (later said to be changed in name to "La Cosa Nostra") that there was a confederation of organized crime groups with the wealthiest and most influential operating in named States.[17]

Hearings were held before the appropriate Committees of both the House and the Senate.[18] In such hearings the same theme was stressed, namely, the existence and power of a super (or sub) government, controlled and disciplined by certain named "families," located in named areas.

Dealing with the problem of organized crime, it was asserted in the Commission Report, presented formidable obstacles. Basically, the problem was said to lie with our American administration of criminal justice.

> Our system of [criminal] justice deliberately sacrifices much in efficiency and even in effectiveness in order to preserve local autonomy and to protect the individual. Sometimes it may seem to sacrifice too much. For example, the American system was not designed with Cosa Nostra-type criminal organizations in mind, and it has been notably unsuccessful to date in preventing such organizations from preying on society.[19]

The local autonomy here described stems, of course, from the fact that we have no national police force and that the suppression of local crime has long been regarded as a local problem. The difficulties resulting therefrom and confronting the Department of Justice in its efforts to cope with crime were described at length by representatives of the Department of Justice to both House and Senate Committees. We have noted heretofore, with respect to federal criminal laws grounded on the commerce clause, that the statute involved the federal jurisdiction only upon the establishment of a connection between the prohibited activity and interstate commerce. This essential element to the federal jurisdiction was portrayed by the representatives of the Department of Justice as a "loophole" in the law. It would facilitate prosecutions, it was claimed (and would be much cheaper) if this troublesome "loophole" could be closed by a finding by the Congress that the Activity involved (and we are here referring to the gambling testimony) affected interstate commerce. Thus it was stated:

"Before you is bill [S. 2022][20] which is designed to bring to bear on the vast business of illegal gambling a substantially increased effort on the part of Federal law enforcement officers."[21] . . . "Title II of S. 2022, which would make it a Federal crime to engage in an illegal gambling business, will provide a much needed weapon in the fight against organized crime by filling a loophole that presently prevents Federal prosecution of huge gambling rings

---

15. *Id.*, p. 187.

16. *Id.*, pp. 188–189.

17. *Id.*, p. 192.

18. See Hearings before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess. 88–89 (1970), [hereafter House Hearings]; Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. 382–88 (1969), [hereafter Senate Hearings]; Report of the Committee on the Judiciary, 91st Cong., 1st Sess., 91–617 (1969); Hearings Before the Permanent Subcommittee on Investigations of the Committee on Government Operations, U. S. Senate, 87th Cong., 1st Sess. (Aug.–Sept., 1961); Hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 87th Cong., 1st Sess. (May, 1961); Report of the Committee on the Judiciary, House of Representatives, 91st Cong., 2d Sess., No. 91–1540 (1970); 116 Cong.Rec. pp. 575–607 (1970).

19. Commission Report, *supra*, note 5, at p. 7.

20. S. 2022, "the illegal gambling bill," p. 396, Senate Hearings.

21. Testimony of Assistant Attorney General Will Wilson, p. 381, *Id.*

whose activities are of legitimate concern to the Federal government. Under existing Federal legislation (18 U.S.C. §§ 1084, 1952, 1953) [See note 12 of this opinion], interstate travel or use of an interstate facility must be proved as part of each case. Under S. 2022, the need for such proof would be obviated on the basis of congressional findings that illegal gambling as a whole has an adverse effect upon interstate commerce and its facilities."[22]

Additional testimony of representatives of the Department of · Justice stressed repeatedly the difficulty of establishing the necessary interstate nexus. Thus

> We also have had a great deal of difficulty in establishing jurisdiction in current investigations. We have continued to investigate, and we finally found in one case the jurisdictional peg under 18 U.S.C. § 1952. But all of that could have been circumvented and shortcut if we had had a statute which would enable us to operate on that gambling enterprise as it existed —that is, a numbers operation in a major city assisted by local police officers, protected by local police officers, with indeed affirmative action of obstruction of justice and obstruction of Federal investigation if we had had the jurisdiction to act.

> But this business of being able to prove what we know, that gambling does affect interstate commerce, has been the difficulty.[23]

Fears were expressed in the Congress that the legislation proposed might extend Federal criminal jurisdiction into purely local areas. This was not the intent, it was explained.[24] Moreover it was repeatedly stressed that the purpose of the Act was to get at only "large-scale business enterprise of gambling" (p. 71 Senate Report 91–617), "substantial business enterprises of gambling" (*Id.*, p. 73), and not the intent "to bring all illegal gambling activity within the control of the Federal Government. Title VIII deals only with those who are engaged in an illicit gambling business of major proportions" (*Id.*, p. 73.) The legislative history found in U.S. Code Congressional and Administrative News, 91st Congress, Second Session, 1970, Vol. 2, p. 4029, is to the same effect:

> The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function.

Such was the intent, and the bill as passed, now § 1955 of Title 18, United States Code,[25] [hereinafter Act], is be-

---

22. *Id.*, at 382, 383.

23. *Id.*, at 399.

24. *E. g.*, "SENATOR McCLELLAN. I support the very laudable objectives of S. 2022, the illegal gambling business bill. Nevertheless, there are some reservations that I must express. I am concerned that the effect of this bill would be to extend Federal jurisdiction so far that it would be virtually the same as local criminal jurisdiction in this area. Now you have mentioned this problem in your remarks already.

MR. WILSON. We have tried to head that off, and if we haven't done it, it needs to be done, because it is· not our purpose to move all this into Federal courts." [Senate Hearings, p. 396].

25. § 1955. Prohibition of illegal gambling businesses
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an

fore us, challenged as to its constitutionality.

It will be recalled that the problem reported upon by the Presidential Commission Report was that of "Organized Crime."[26] The testimony at the Congressional Hearings and the Reports thereon concerned the evils and ramifications of "organized crime." This was the cancer in our social body. But § 1955, before us is not directed against "organized crime". There is no definition of organized crime in the Act, to aid the courts in the interpretation thereof. "I think the fact of the matter is," explained a representative of the Department of Justice, "that 'organized crime' is a rather generic definition."[27] Here, in

illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

Added Pub.L. 91–452, Title VIII, § 803(a), Oct. 15, 1970, 84 Stat. 937.

26. Commission Report Ch. 7.

27. Henry E. Petersen, Deputy Assistant Attorney General, Department of Justice, House Hearings, p. 177. See, also, the dissenting views of Representatives Conyers, Mikva, and Ryan also stressing such lack (p. 196, House Report 91–1549).

"Never has a bill masqueraded under false pretenses more than the Organized Crime Control Act. From its title all the way through title XI, on bombing, it promises succor to an anxious nation. It will not deliver, because it seeks easy answers to hard and expensive problems. Even in its draftsmanship it would rather equivocate than fight. Thus one searches the bill in vain for a definition of 'organized crime.' In a criminal statute where the term 'organized crime' is an operative device, it is not defined. When asked about the omission, the drafters explained that it was impossible to define, but everybody knew what it was.

"On such shoals has the crime fight come a cropper. Wherever the real effort is to be made to remove crime, organized and otherwise, from the everyday fears of the American citizen, one will not find it in the

fact, we get into one of the fundamental criticisms of the Act.

> "The basic criticism leveled at the Act as a whole is that it goes beyond the scope of attacking the phenomenon of organized crime and into areas that either were not intended to be affected or should not be affected by the stringent measure of the Act." [28] (footnote omitted). 32 Ohio St. L.J. at 620.

The vice in the overbreadth situation obviously, is the threat to individual liberties.

What finally emerged from the hearings was a conglomerate of bills under different "Titles," now found in various sections of the United States Code. Nowhere in the conglomerate do we find an "Organized Crime" proscription as such. The particular portion of the final act with which we are concerned, is found in Title VIII, styled "Syndicated Gambling," Title 18, U.S.C. § 1955.

The legislative history respecting this Title, we have set forth in part. Its thrust is clear: the Congress was concerned only with major operations in the gambling world. Senator Allott explained in detail:

> To help dry up this source of huge criminal revenues, title VIII will make it a Federal offense to engage in any large-scale business enterprise of illegal gambling. It does not purport to bring all illegal gambling activity within the control of the Federal Government. *It deals only with those who are engaged in an illicit gambling business of major proportions, as distinguished from those whose opera-*

*tions are relatively small.*[29] (Emphasis ours.)

Thus as a practical and factual matter the proponents of the bill set up a dichotomy, reflected in turn by the Act itself: gamblers of major proportions (to be prosecuted) as separated from minor operators (who are to be left untouched by the federal Act).[30] This differentiation, we will note at this point, is not found in Perez v. United States, 402 U. S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) which will be analyzed in detail at a later point herein. It remains to ascertain the basis upon which the differentiation was accomplished and the classification made.

There was much testimony, some of which we have quoted, respecting the evils of organized crime. But, when we finally, after all of the reports, the hearings, and the testimony, get down to the actual crime defined, under which these appellants have been indicted, tried, and convicted, we find nothing about organized crime, but rather proscribed is the crime of "illegal gambling," that is, gambling as defined in § 1955, meaning essentially, that it is in violation of local law, involves five or more persons, and has a gross take of $2,000 in any single day.

The Act, constitutionally, as we have noted, is grounded on the Commerce Clause. We have documented the broad sweep of the Clause in today's interrelated society. But broad as it may be, it is not without its constitutional limitations. Although "[T]he commerce power invoked here by the Congress is a specific and plenary one authorized by the Constitution itself" the problems

---

Organized Crime Control Act. Like the defining of 'organized crime,' the drafters of the bill found the task too hard.

"We oppose this bill. It should not be enacted into law. We must conclude with Mr. Justice Stewart, writing in Elkins v. United States, 364 U.S. 206 [80 S.Ct. 1437, 4 L.Ed. 2d 1669] (1960), that 'nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' "

See, also, Lehman, Crime, The Public, and the Crime Commission: A Critical Review of The Challenge of Crime in a Free Society, 66 Mich.L.Rev. 1487 (1968).

28. Constitutional Problems Presented by the Organized Crime Control Act of 1970, 32 Ohio St.L.J. 618 (1971).

29. 116 Cong. Rec. 603.

30. [Footnote 30, not relevant herein, is omitted.]

facing the court in any given case are "(1) whether Congress had a rational basis" for its relevant findings and "(2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate." [31] As to basis, it is clear that something more than a naked assertion is required, for "the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court." [32] We proceed, then, to the rational basis inquiry.

In the testimony of Assistant Attorney General Will Wilson, in referring to "the vast business of illegal gambling" and the necessity for expanding "the available forces in the fight against this pervasive and pernicious enterprise" he describes an "illegal gambling business" (such is the caption of § 1955, note 25 *supra*) as "one which is in violation of state or local law, which involves five or more persons who operate, participate in or derive revenue from it, and which either has been in operation for longer than 30 days or has a single day's gross revenue of $2,000 or more." [33] Questioned as to these figures, Mr. Petersen, Deputy Assistant Attorney General explained their employment. [34]

> SENATOR HRUSKA. Do you feel that the proof of the size and duration of a gambling operation as it is defined in S. 2022 would be as difficult to establish as proof of an interstate "link" in that type of operation?
>
> MR. PETERSEN. No; I don't think so. With respect to proof of duration, conceivably that could be very difficult, 30 days' proof, every day for a 30-day period might be very difficult. Even gamblers take a day off occasionally. But the $2,000 in any given

day, based on our experience, we think we can prove.

If we can't establish $2,000 it is obviously not a Federal case. We ought not to be involved in it.

Most of these instances, given probable cause to raid a gambling establishment which we have been able to observe, we know it has been operating for 4 or 5 days a week, seizing the records that exist, we have been able to come up with better than $2,000 a day in most all of our cases.

This, and we have found nothing more precise or specific, establishes nothing more than the results of certain raids. There is no correlation made, on any factual basis, between the owners or operators of such establishments and organized crime or syndicated crime. There is no factual tie-in made or link established between these operations thus raided and interstate commerce. Although in the Commission Report it is said that "organized crime in its totality thus consists of these 24 groups allied with other racket enterprises to form a loose confederation operating in large and small cities" [35] across the Nation, and although these groups (each known as a "family") are the subject of much testimony in the legislative hearings, identified as to names and locations, [36] there is no effort in the above testimony to link the raids to any of these groups or families who are asserted to be the leaders of organized crime or even to the areas in which they allegedly operate. We know nothing of the circumstances under which these raids were conducted. We know nothing of the validity of the sample described. If the experience with these gambling establishments is relied on to furnish the link with organized crime of those doing a business

31. Heart of Atlanta Motel, Inc. v. United States, *supra*.

32. Katzenbach v. McClung, *supra*.

33. P. 381, Senate Hearings. See, also, Commission Report, pp. 188–189, 116 Cong.Rec. 590–91, 603, 604 (1970).
 See, also, note 27.

34. PP. 399, 400, Senate Hearings.

35. Commission Report, p. 193.

36. P. 124 Senate Hearings et seq.

having the defined characteristics, it is essential that some foundation be laid. It was not. We are left with what amounts to no more than a diary entry, informative as to certain raids, but without significance as a basis for a nationwide criminal jurisdiction based upon the commerce clause. The class as thus defined has no rational basis. Moreover, it cannot derive from a common understanding for such was not shown, if, in fact, it exists at all. It cannot rest in empirical studies, for we have none. It rests, if at all, in the results of some raids somewhere at some time. This is not enough.

The *Perez* case is cited as controlling decision in the case before us. It has a similarity, in that it also involves the attempted control of another facet of organized crime, namely, that of "loan sharking," credit transactions characterized by the threat or use of "violence or other criminal means" in the enforcement of repayment.[37] In *Perez* the Court found that a rational determination had been made by the Congress that loan sharking activities affected interstate commerce. With respect to such Congressional determination the problem facing the court, as we have heretofore pointed out, was, "whether Congress had a rational basis" for its relevant finding.[38] It was, indeed, so, held, in *Perez*, but the determination that loan sharking activities, as a class, has the interstate ties warranting federal proscription does not, of course, furnish a basis for finding that all other activities of organized crime, whatever that undefined term may encompass, and wherever it is employed, also affect interstate commerce. It is not an incantation, sufficient, once uttered, to invoke the commerce clause. In each instance such de-

termination must rest upon the facts shown and it is our duty, unless there is simply to be a wholesale judicial abdication, to pass upon the validity of such determination.[39] In our judgment, as we have set forth in more detail hereinabove, there was no rational basis for the Congressional finding that the class as defined has the requisite interstate ties.

It does not answer to argue that the Congress could have declared that all unlawful gambling has interstate ties, as it did with respect to all loan sharking. Too many lodge-hall poker players will testify to the contrary. The essence of our problem here, indeed the problem itself, is the classification made. The line between the big operators, the controllers of the vast illegal empires, who were the targets of the act, and the lesser gamblers who, it was repeatedly stated were to be untouched by the Act, was drawn without rational basis. The problem of over-inclusion is obvious.

Nor is it an answer to a criminal defendant who argues that there is neither proof nor nexus as to the interstate activities of his class to cite to him Maryland v. Wirtz, *supra,* holding that when a class is within reach of the federal power, the courts have no power "to excise, as trivial, individual instances" of the class. This thought is variously expressed in the cases, from Mr. Justice Holmes in Westfall v. United States, 274 U.S. 256, 259, 47 S.Ct. 629, 71 L.Ed. 1036 (1927), "when it is necessary in order to prevent an evil to make a law embrace more than the precise thing to be prevented, it [the Congress] may do so,"[40] to the reference of Mr. Justice Douglas in *Perez, supra,* respecting the problem of particularized findings by the Congress.[41] We have no quarrel

37. 18 U.S.C. § 891 et seq.

38. Heart of Atlanta Motel, Inc. v. United States, *supra.*

39. Katzenbach v. McClung, *supra.*

40. Moses v. McKesson & Robbins, 43 F.Supp. 528, 530 (S.D.Texas, 1942) cites this case to the proposition that "Undoubtedly, under

some circumstances, Congress, in its regulation of Interstate Commerce, may also regulate intrastate activities where they have a substantial effect on Interstate Commerce."

41. "We have mentioned in detail the economic, financial and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particular-

with such holdings. But the issue now before us must be resolved before there is occasion for the application of their teachings.

We do not believe it consistent with the past holdings of the Supreme Court to extend the Perez ruling beyond the particular facts there involved. The use of violence in credit transactions is a crime of a peculiar and unique nature, not, as unlawful gambling, an offense found in every hamlet in the nation. With respect to the gambling impediments involved in United States v. Five Gambling Devices, 346 U.S. 441, 463, 74 S.Ct. 190, 202, 98 L.Ed. 179 (1953), Mr. Justice Clark, in dissenting, used terminology equally applicable here when he pointed out that ". . . the situation here is unique: the commodity involved is peculiarly tied to organize interstate crime. . . ." But, more fundamentally, the Court has in the past been reluctant to construe federal criminal laws broadly, and, accordingly, has sustained conviction only when the offense was clearly within the confines of the act under consideration. Thus in Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971) the Court stated, with respect to the Travel Act,[42] that it would not interpret the Act to apply to the fact situation before it, declaring that "Congress would certainly recognize that an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies."[43]

This latter point is peculiarly appropriate to the matter here under consideration. The moral judgment of the peoples of the various states, as expressed through their elected representatives as to the gravity of the offense involved, gambling, has been completely overridden[44] and not upon grounds of compelling national necessity[45] but without demonstrable, rational grounds.

What we now confront, construing the Act (as the Government urges we do) in accordance with the precedents in the Commerce cases, is an act that, although establishing a federal crime, need not be uniform in its application nationwide, since it has been held that there is no requirement of national uniformity when Congress exercises its power under such clause. Secretary of Agri. v. Cent. Roing Refining Co., 338 U.S. 604, 70 S. Ct. 403, 94 L.Ed. 381 (1950); Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L. Ed. 441 (1939); Clark Distilling Co. v. Western Md. Ry. Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917). At this point:

> It is relevant to remind that our Constitution is one of particular powers given to the National Government with the powers not so delegated reserved to the States or, in the case of limitations upon both governments, to the people. Except insofar as penal remedies may be provided by Congress under the explicit authority to "make all Laws which shall be necessary and proper for carrying into Execution" the other powers granted by Art. I, § 8, the bulk of authority to legislate on what may be compendiously described as criminal justice, which in other nations belongs to the central government, is under our system the responsibility of the individual States.[46]

---

ized findings in order to legislate." Perez, *supra*, at p. 156 of 402 U.S., at 1362 of 91 S.Ct.

42. 18 U.S.C. § 1952.

43. Rewis, *supra*, at p. 812, 91 S.Ct. at p. 1059.

44. House Hearings, p. 192: "The laws of the various States that prohibit gambling vary

of course in the amount of the penalties that they impose and they may be, I gather, as low as a $100 or a $50 fine."

45. See Wechsler, Political Safeguards of Federalism, Selected Essays on Constitutional Law, 185 (1963).

46. Knapp v. Schweitzer, 357 U.S. 371, 375, 78 S.Ct. 1302, 1305, 2 L.Ed.2d 1393 (1958).

Under this and similar principles the greatest caution is demanded in the formulation of Federal crimes. We require a clear and specific link into the interstate stream, resting not on rhetoric but upon demonstrable fact, lest our people be subject to a patchwork of Federal law, the citizen becoming a felon here or guiltless there for the commission of the same physical act. The Federal crime before us is not, in fact, made a crime nationwide. It may be a crime here, but a few miles away it is not a crime at all. The situation presented challenges the most careful scrutiny as to its justifications. While we recognize that it has been held on highest authority that the Tenth Amendment expresses "but a truism—that all is retained that has not been surrendered"[47] yet we take it that the Tenth Amendment, notwithstanding, preserves the continued existence of the states as responsible governmental units, not mere administrative units, such as county boards.[48] Our consideration of the practical effect of the law on the public policies of the states and their government is mandated to us by the Tenth Amendment, and requires consideration in addition to the possible erosion of individual liberties always encompassed in overbroad criminal definitions.

The case of United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) continues judicial examination into this troubled area. There the Court had under consideration Title VII of the Omnibus Crime Control and Safe Streets Act. This portion of the Act provided that "any person who—(1) has been convicted by a court of the United States or of a State . . . of a felony . . . and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be . . ." etc. The Second Circuit had reversed his conviction.[49] The government contended for a broad reading of the statute, that the statutory language "in or affecting" commerce modified only the word "transports" and not the entire phrase "receives, possesses, or transports." In affirming the Second Circuit's reversal the court refused to adopt the broad reading urged by the government, not only because of the ambiguity present in the statute but because of the consideration set forth in full below:

"There is a second principle supporting today's result: unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This congressional policy is rooted in the same concepts of American federalism which have provided the basis for judge-made doctrines. See, e.g., Younger v. Harris, 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669] (1971). As this Court emphasized only last Term in Rewis v. United States, supra, we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legis-

See, also, Darby, *supra*, at p. 124, of 312 U. S., 61 S.Ct. 451, and the dissent of Justice Stewart in Perez v. U. S., *supra*, at p. 157 of 402 U.S., 91 S.Ct. 1357.

47. United States v. Darby, 312 U.S. 100, 123, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941).

48. In commenting on the role of the states in today's society, Dean Fordham of the University of Pennsylvania Law School wrote in part as follows in 49 Va.L.R. 666, 668 (1963):
"State responsibility for so-called law and order is primary. The principal body of private law is state law. The basic system of criminal justice and law enforcement is the state system. This is emphasized by the Assimilative Crimes Act, through which Congress has borrowed state criminal law for federal enclaves." It will be noted that the theory of the act before us is directly contrary to that of the Assimilative Crimes Act, 18 U.S.C. § 13 in that the punishments under the Act before us are not those of the states but those of the Act itself, thus, as we have observed, overriding the public policy of the states themselves as to the severity of the offense involved.

49. United States v. Bass, 434 F.2d 1296, 1300, (2d Cir. 1970) "an unprecedented extension of federal power."

lation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision. In *Rewis*, we declined to accept an expansive interpretation of the Travel Act. To do so, we said then 'would alter sensitive federal-state relationships [and] could overextend limited federal police resources.' While we noted there that '[i]t is not for us to weigh the merits of these factors,' we went on to conclude that 'the fact that they are not even discussed in the legislative history . . . strongly suggests that Congress did not intend that [the statute have the broad reach].' 401 U.S., at 812, [91 S.Ct. 1056, 1059]. In the instant case, the broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction. As in *Rewis*, the legislative history provides scanty basis for concluding that Congress faced these serious questions and meant to affect the federal-state balance in the way now claimed by the Government. Absent a clearer statement of intention from Congress than is present here, we do not interpret § 1202(a) to reach the 'mere possession' of firearms." 404 U.S. at 349–350, 92 S.Ct. at 523. (Footnotes omitted.)

The significance of the above, for our purposes, is obvious. The majority was reluctant, for the reasons enunciated, to confront the constitutional issue, despite *Perez*, stating that "In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally

punish the 'mere possession' of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in Perez v. United States, 402 U.S. 146, [91 S.Ct. 1357, 28 L.Ed.2d 686] (1971)."[50]

We have adverted to the ever-widening scope given to the Commerce clause. With respect to the criminal law the results of a broad construction thereof may effect profound changes in our society resulting in, as a practical matter, a redistribution and reallocation of powers and responsibilities within our federal-state system. But as the sweep and breadth of the Commerce clause is sought to be increased, our reading of United States v. Bass, *supra*, indicates that solicitude for its impingement on other constitutional restraints becomes even more acute. The clause does not stand alone. It is part of a cohesive, integrated structure, each member of which has strength, thrust, and meaning. We need not cite to or overstress the obvious. The Federal government is one of limited powers.

After all of the testimony had been heard about the illegal empires, and we do not presume to question their existence on the record, after all of the research into the "families" and their machinations and worse had been taken, and we finally leave the realm of generalities and get down to specifics, what we have here to warrant the findings of the required relationship between interstate commerce and the illegal gambling businesses as defined in Section 1955, *supra* is nothing more than the result of some raids made somewhere sometime ago under undisclosed circumstances. This is not enough.

Finding that the Congress had no rational basis for concluding that the illegal gambling businesses as defined in Title 18, § 1955, *supra*, affected commerce[51] we hold such portion of the Act to be unconstitutional.[52]

---

50. United States v. Bass, *supra*, at p. 339 note 4, 92 S.Ct. at p. 518.

51. Wickard v. Filburn, *supra*.

52. It follows *a fortiori* that the conclusion we have here reached applies as well to Section 1511 of Title 18, defining "illegal gambling business" *in haec verba*.

The foregoing ends the brilliant composition of the distinguished Judge Smith, insofar as the composition is germane to the case at hand.. I interpret Judge Smith's final paragraph as expressing the finding that there was no demonstrated rational basis of such strength as to support a conclusion that the business defined in 18 U.S.C. § 1955 affected interstate commerce so significantly that the commerce clause could constitute the necessary foundation for the legislation. In these times almost everything that man does and almost every transaction in which he is engaged could be said to affect interstate commerce to some degree. I cannot believe, however, that those who framed the Constitution ever intended that a local activity, barely affecting commerce, could, upon that basis, be characterized as a federal crime. It was never intended, I submit, that the federal courts should be required to concern themselves with so many offenses that essentially are no more than mere peccadilloes. Now, if some youth steals a dilapidated automobile in Nevada and drives it into California he has committed a felonious federal offense, even though the vehicle may be worth no more than $50. So, too, is a man a felon under the federal law if he transports a woman across a state line for immoral purposes. Since interstate commerce is obviously involved in these instances, I could not, of course, find a legitimate basis upon which to strike down the Dyer Act or the Mann Act as violative of constitutional prohibitions. I cite these instances only for the purpose of emphasizing my belief that while in earlier times the federal government may have been the only body capable of dealing with such offenses, we have now arrived at an age in which our communications are so advanced and our state judiciaries and state police are generally so competent and effective that not only should many of our federal penal statutes be repealed, but also the Congress should be more and not less hesitant in characterizing local activities as federal offenses,

thus making further encroachment into areas of state powers and state rights. As it is, however, the Congress continues to create more and more federal crimes, thereby enlarging the heavy burdens already imposed upon the federal courts and necessitating the creation of more and more federal judgeships, both at the district and court of appeals level. Surely we have arrived at a point when the federal courts should have the courage to say to the Congress. "This far, and no farther!" In his opinion, the distinguished Judge Talbot Smith has reflected the type of judicial courage that I have in mind and moreover, reached his conclusion by a process of reasoning that I find unassailable. I heartily concurred in Judge Smith's opinion when it was originally submitted, and although I maintain the deepest respect for my Brother Choy and our other colleagues, there is nothing in the majority's opinion in this case that induces me to alter the opinion held by me from the beginning. I would reverse.