UNITED STATES of America
v.
Michael CHIARIZIO et al.
Crim. No. H–74–51.

United States District Court,
D. Connecticut.

Jan. 21, 1975.

Peter C. Dorsey, U. S. Atty., Paul E. Coffey, Sp. Atty., Dept. of Justice, Hartford, Conn., for plaintiff.

Maxwell Heiman, Bristol, Conn., Michael J. Daly, III, Waterbury, Conn., John P. McKeon, Hartford, Conn., F. Owen Eagan, and William P. Murray, Jr., West Hartford, Conn., Albert Genua, Jr., Hartford, Conn., Charles Sturtevant, Hartford, Conn., J. Patrick Dwyer, East Hartford Conn., S. Robert Verrillo, Hartford, Conn., John W. Daniels, Huntington, W. Va., Timothy G. Moynahan, Waterbury, Conn., Paul J. McQuillan, New Britain, Conn., James D. O'Connor, Hartford, Conn., for defendants.

## RULING ON DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT AND SUPPRESS EVIDENCE

BLUMENFELD, District Judge.

The twelve defendants in this case are under indictment for violation of 18 U. S.C. § 1955 (1970)[1] and § 371 (1970). They have raised a number of challenges to the indictment and the wiretap evidence which was obtained pursuant to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. An evidentiary hearing having been held on certain elements of the defendants' motion to suppress and all briefs having been submitted, this matter is now ready for decision.

### Motion to Dismiss the Indictment

As if following a checklist in a manual on defending § 1955 cases, the defendants have raised a series of challenges, most of which have been definitively discussed and rejected by either

---

1. § 1955 provides in relevant part:

 "(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both

 "(b) As used in this section—

 (1) 'illegal gambling business' means a gambling business which—

 (i) is a violation of the law of a State or political subdivision in which it is conducted;

 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

 (2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

 (3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

 "(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and. other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established."

the Second Circuit or other Courts of Appeal. For that reason, most of the issues require little or no discussion.

■ Thus, the statute is not unconstitutional because it adopts as an element of the offense the violation of state gambling laws. United States v. Sacco, 491 F.2d 995 (9th Cir. 1974); Schneider v. United States, 459 F.2d 540 (8th Cir.), cert. denied, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972); United States v. Aquino, 336 F.Supp. 737 (E.D.Mich.1972). Cf. United States v. Burton, 475 F.2d 469 (8th Cir.), cert. denied, 414 U.S. 835, 94 S.Ct. 178, 38 L. Ed.2d 70 (1973). Also it was validly adopted pursuant to Congress' plenary power under the Commerce Clause and thus was not an unconstitutional infringement upon the powers of the states under the tenth amendment. United States v. Sacco, supra; United States v. Becker, 461 F.2d 230 (2d Cir. 1972), vacated on other grounds, 417 U. S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974); United States v. Harris, 460 F. 2d 1041 (5th Cir.), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972). Nor is § 1955 unconstitutionally vague. United States v. Sacco, supra, 491 F.2d at 1001–1002. Cf. United States v. Meese, 479 F.2d 41, 43 (8th Cir. 1973); United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L. Ed.2d 107 (1973); United States v. Becker, supra, 461 F.2d at 232.

■ The defendants also argue that §§ 1955 and 371 merge into one because both statutes require the concerted action of more than one person. This contention, based upon "Wharton's Rule," is also foreclosed under United States v. Becker, supra in which the Second Circuit stated:

"Appellants next argue that because the alleged substantive offense required the participation of five or more persons, a conspiracy count based upon the same illegal conduct was improper, under the doctrine that 'Where concert is necessary to an offense, conspiracy does not lie.' United States v. Sager, 49 F.2d 725, 727 (2d Cir. 1931). United States v. Center Veal & Beef Co., 162 F.2d 766, 770 (2d Cir. 1947); United States v. Zeuli, 137 F.2d 845, 846 (2d Cir. 1943). The answer is that in this case an additional two persons, or seven in all, were named in the indictment as having engaged in the conspiracy, whereas the substantive offense required the participation of only five. It is a fundamental principle, too settled to require explication, that 'the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.' Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). As we have recently reiterated, as long as the conspiratorial concert of action and the substantive offense underlying it are not coterminous and fewer participants are required for the commission of the substantive offense than are named as joining in a conspiracy to commit it, there is no infirmity in the conspiracy indictment. United States v. Benter, 457 F.2d 1174, 1178 (2d Cir. 1972)." 461 F.2d at 234.

In the instant case twelve persons were named as co-conspirators, seven more than are needed to support a conviction under § 1955. See United States v. Iannelli, 477 F.2d 999, 1002 (3d Cir. 1973), cert. granted, 417 U.S. 907, 94 S.Ct. 2602, 41 L.Ed.2d 211, 42 U.S.L.W. 3652 (U.S. May 28, 1974) (No. 73–64).

The defendants also advance a rather ingenious, but ultimately meritless, argument based upon the doctrine of pardon and abatement. The indictment in this case was issued on April 9, 1974, and charged the defendants with being continuously in violation of Conn.Gen. Stat.Ann. § 53–295 (1958) from March 1, 1973 through May 15, 1973.[2] On

2. In its bill of particulars as quoted below, the government has informed the defense that it is relying upon a particular section of Conn. Gen.Stat.Ann. § 53–295 (1958):

" 'Pool Selling
'Any person, whether as principal (or) agent, who owns, possesses, maintains or occupies any building, room, office in

June 7, 1973 as part of Pub.Act No. 73–455, § 53–295 was repealed. As a result, the defendants argue, under the doctrine of pardon and abatement, all proceedings under § 53–295 "which were not passed and closed, are thereby arrested as if the statute never existed." Defendants' Brief at 9. As § 1955 depends upon the violation of a state gambling statute, they continue, all prosecutions under § 1955 which depend upon § 53–295 must be abated.

■■ It is unnecessary to pass upon the defendants' basic argument that the repeal of a state gambling law subsequent to the commission of an offense under it would necessarily abate a federal prosecution under § 1955. *Cf.* United States v. Revel, 493 F.2d 1 (5th Cir. 1974) (federal, not state, statute of limitations applies under § 1955). This is because the doctrine of abatement and pardon has no application under the facts of this case. Section 53–295 was only technically repealed under Pub.Act No. 73–455 which was a comprehensive enactment of a model gambling law. It is quite clear that the offenses which were proscribed and relied upon by the government under § 53–295 remain illegal under Pub.Act No. 73–455, §§ 1(3), 2, 3(d), 5(d). *See* United States v. Romanello, Crim. No. H–203 (D.Conn., Sept. 14, 1972).

■■ The defendants also claim that § 53–295 is unconstitutionally vague. In particular, they focus upon that part of the statute which provides that "any person who makes, records or registers any such wagers or bets, or buys or sells, or *is concerned* in buying or sell-

ing, any such pools . . . ." (Emphasis added.) The language "is concerned," they contend, is unconstitutionally vague. In passing upon such a challenge it is necessary to remember that "the Constitution does not require impossible standards." A statute need only convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947); Roth v. United States, 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). When considered in the context of this statute which is detailed and specific with regard to the proscribed conduct, it is clear that the language which the defendant focuses upon is not unduly vague. State v. Inzitari, 6 Conn.Cir. 170, 269 A.2d 35 (1969). Furthermore, that language is no more ambiguous than that in § 1955 which this court and others have held to be specific enough to pass constitutional muster. Finally, it is doubtful that these defendants even have the standing to raise this particular vagueness claim, as the "is concerned" language is not included in that part of § 53–295 upon which the government is relying in this prosecution.[3] In sum, this court agrees with the conclusion reached in United States v. Romanello, *supra,* slip op. at 15, with regard to the same vagueness issue: the claim is "meritless."

Finally, the defendants seek dismissal of the indictment on the basis that the grand jury which returned the indictment was unconstitutionally or illegally constituted. They advance two separate,

keeping, maintaining or occupying an[y] building, room, office, enclosure or place with books or any device for the purpose of making, recording or registering bets or wagers upon the result of any contest of skill, speed or endurance of man (or) beast, or upon the result of any game (or) competition, whether such contest, game or competition takes place within or without the state, and any person who being the owner, lessee or occupant of any building, room, enclosure or place, or part

thereof, knowingly permits the same to be used or occupied for any such purpose . . . (is guilty of a crime).

'Any person who becomes the custodian or depositary of any money, property or thing of value in any manner wagered or bet upon such result, or of any apparatus of any kind used for the purpose of assisting in making any such wagers or bets, shall be punished in like manner.' "

3. *See* footnote 2, *supra.*

somewhat contradictory, arguments. I shall consider each in turn.

■ First, they argue that the indictment was returned by a special grand jury, impaneled pursuant to the provisions of 18 U.S.C. § 3331 (1970). That statute provides in relevant part:

"(a) In addition to such other grand juries as shall be called from time to time, each district court which is located in a judicial district containing more than four million inhabitants or in which the Attorney General, the Deputy Attorney General, or any designated, Assistant Attorney General, certifies in writing to the chief judge of the district that in his judgment a special grand jury is necessary because of criminal activity in the district shall order a special grand jury to be summoned at least once in each period of eighteen months unless another special grand jury is then serving."

The defendants find objectionable the fact that this statute seems to deprive the court of its inherent discretion to decide when and whether to convene a grand jury. By providing that the court "shall" order the summoning of a grand jury when one of the two preconditions is satisfied, Congress, the defendants urge, has usurped the inherent power of the judiciary and has thus violated the constitutional principle of separation of powers.

The government argues that the separation of powers issue need not be reached because § 3331(a) does not, in fact, mandate the creation of a special grand jury; rather, the two alternate preconditions under the statute merely provide the factual backdrop for the exercise of the court's discretion. This appears to have been recognized by former Assistant Attorney General Henry Peterson,[4] who, in a letter to this court dated September 12, 1973, *requested* that a special grand jury be convened pursuant to § 3331.[5] Of course, it is likely that the Assistant Attorney General was merely exercising respectful restraint in his choice of language and expected the court to comply with the statute's mandate upon receipt of his letter.

In any case, a grand jury was convened on October 10, 1973, to investigate organized crime in this district. A reading of the transcript of the impanelment of that grand jury does not indicate whether the court felt required to convene the jury or whether it was freely exercising its discretion in light of the request of the Justice Department. It is not necessary, however, to resolve this factual issue. Even assuming *arguendo* that the statute required the impanelment of the special grand jury upon receipt of the Assistant Attorney General's letter, the grand jury proceeding was free from constitutional taint.

In United States v. Fein, 504 F.2d 1170 (2d Cir. 1974), the Second Circuit had occasion to discuss the very issue presented by the defendants' separation of powers argument. In that case, the District Court had extended the life of a grand jury, which had been convened pursuant to Rule 6(a) and (g) of the Federal Rules of Criminal Procedure, beyond its statutory maximum life of eighteen months. The indictment being challenged was issued during the extend-

4. By Order Number 452–71 the Attorney General delegated to the Assistant Attorney General of the Criminal Division the authority to exercise the functions or duties conferred upon him by 18 U.S.C. § 3331. 28 C.F.R. § 0.59(a) (1974). The defendants do not challenge this delegation.

5. In relevant part that letter stated:
"I hereby certify that in my judgment such a grand jury is necessary because of criminal activity in the District of Connecticut.

"Mr. McDowell [Attorney in Charge of the Boston Field Office] further advised me that there is a grand jury which sits in Hartford once a month for one to three day periods and that grand juries are also impaneled in Bridgeport and New Haven when called by the United States Attorney on a need basis. There is no special grand jury presently sitting in this District. Accordingly, I respectfully request that you order a special grand jury to be summoned on September 20, 1973."

ed term. The government, in a reversal of positions from the instant case, argued that the grand jury is a creature of the court and thus the court had the inherent power to extend the life of a grand jury, even in derogation of the mandate of the Federal Rules of Criminal Procedure. The defendant argued that Congress has the authority to legislate in this area and can thereby limit the court's discretion in dealing with grand juries.

The Second Circuit agreed with the defendant and held that "where Congress has since enacted statutes and courts have adopted rules regulating the power of federal courts over grand juries, the exercise of judicial discretion . . . is effectively precluded." 504 F.2d at 1172. Thus, it is clear that Congress had the authority to require the District Court to convene a special grand jury upon certification of the Assistant Attorney General that such a grand jury was needed in the District of Connecticut.

Alternatively, the defendants argue that the court in impaneling the grand jury did not comply with the requirements of 18 U.S.C. §§ 3331, 3333 (1970) and thus the grand jury which returned the indictment in this case was not a valid special grand jury. The necessary result of such a conclusion, they urge, is that all indictments returned by that grand jury are invalid.

▮ Specifically the defendants argue that at no time during the impaneling process did the court make explicit reference to the existence of one of the two statutory preconditions which must be present before a special grand jury can be convened. They do not, however, contest the fact that the Attorney General Peterson did submit the above-mentioned letter requesting the convening of a special grand jury.[6] Rather they seem to contend that the members of the special grand jury had to be informed of the existence of that letter. Nothing in the statute requires such disclosure to the grand jury itself. All

that is required is that the Attorney General, or his delegate, certify "in writing to the chief judge of the district that in his judgment a special grand jury is necessary because of criminal activity in the district . . . ." 18 U.S.C. § 3331(a). That having been done, there was no further need to refer to that letter explicitly at the impanelment proceedings.

The defendants also find deficient the court's failure to inform the special grand jury of its power to submit to the court a report "(1) concerning noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation of removal or disciplinary action; or (2) regarding organized crime conditions in the district." 18 U.S.C. § 3333(a). While it is true that no such directions were given, it hardly follows that the failure of the court to inform the grand jury of one of its discretionary powers invalidates the grand jury. The grand jury's primary and nondiscretionary function was to investigate organized crime in the District of Connecticut and they were adequately informed of this responsibility. It is hard to see how a defendant has reason to complain that the grand jury which indicted him may not have been informed of its power to file a report with the court. The indictment in this case was returned by a validly convened special grand jury.

▮ Even assuming, however, that it was necessary to inform the grand jury of Assistant Attorney General Peterson's letter and of its power to issue reports pursuant to § 3333(a), it does not follow that the indictments returned by the grand jury impaneled on October 10, 1973 are void. That grand jury would still have been validly convened pursuant to Fed.R.Crim.P. 6(a) and (g), and thus would have the same powers as a special grand jury to return an indictment

6. *But see* note 7, *infra.*

alleging violations of 18 U.S.C. §§ 1955 and 371.

It is true that there are some distinctions between regular and special grand juries, as recognized by the court in United States v. Fein, supra. However, none of those differences are involved here. For example, there is no issue, as in Fein, regarding the return of an indictment beyond the eighteen-month term of the grand jury. The indictment in the instant case was returned approximately six months after it was impaneled. The indictment returned by the grand jury and the circumstances under which it was returned fully comport with the powers of a regular grand jury under Fed.R.Crim.P. 6(a) and (g). Special grand jury or not, the indictment in this case is valid.[7]

The defendants also argue that the indictment is invalid because it resulted in whole or in part from the presentation of illegally intercepted wire communications. But see United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed. 2d 561 (1974). In light of this court's holding with regard to the defendants' motion to suppress, infra, it is unnecessary to consider the merits of this argument.

In addition, the defendants have raised a number of other challenges which they did not brief and which are totally without merit.

### Motion to Suppress Evidence

The defendants have moved to suppress the results of wiretaps conducted by the Federal Bureau of Investigation in the course of the investigation which led to the indictment in this case. As in the case of their motion to dismiss, several of the grounds of their motion are meritless in light of the existing and controlling case law and thus warrant little discussion. Other grounds require more considered treatment.

The evidence which they seek to suppress was the fruit of two series of wiretap interceptions authorized by this court pursuant to the provisions of 18 U.S.C. § 2518 (1970). The first such wiretap was authorized on March 22, 1973 upon an application submitted by Paul Coffey, Departmental Attorney for the United States Department of Justice, which was supported by the affidavit of FBI agent Dewey Santacroce and the approval of then Attorney General Richard Kleindienst, as required by the provisions of 18 U.S.C. § 2516(1) (1970).[8] At the same time, the court also authorized the use of a pen register, a device which reveals the telephone numbers of all outgoing calls dialed from the wiretapped telephone.

---

7. The court has denied the defendant Chiarizio's motion to inspect and "subject to scientific analysis" the September 12, 1973 letter of Assistant Attorney General Peterson requesting the convening of a special grand jury in this district. The obvious intent of the defendant is to submit the signature on the letter to a handwriting analyst for a determination as to whether it really is that of Mr. Peterson. In light of the above holding, that issue is irrelevant. Even if the letter of the Assistant Attorney General were invalid, the grand jury convened on October 10, 1973 was properly impaneled pursuant to Rule 6(a) and (g).

8. The defendants suggest that they intend to take the deposition of Mr. Kleindienst to determine if he actually signed the letter of authorization and, if so, whether he exercised "mature judgment," United States v. Giordano, 416 U.S. 505, 514, 94 S.Ct. 1820,

1826, 40 L.Ed.2d 341, 353 (1974) or perfunctorily endorsed the application placed before him. The defendants' inquiry is obviously prompted by Giordano in which the Supreme Court strictly interpreted 18 U.S.C. § 2516 (1970) and held that only the Attorney General or an Assistant Attorney General specially designated by him could approve an application for wiretap authorization. In the instant motion the defendants do not present this issue and so I intimate no views as to the propriety of the inquiry which they intend to undertake. For a view that no inquiry can be undertaken into the degree of consideration which the Attorney General gives requests for authorization, see the pre-Giordano decision in United States v. Consiglio, 342 F.Supp. 556, 560 (D.Conn. 1972), aff'd, 486 F.2d 1397 (2d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 223 (1974).

The principal target of their motion is the authorized wiretap (hereinafter referred to as the "Chiarizio tap") on the telephone of Mrs. Maria Rubera of 1889 Broad Street in Hartford. In Agent Santacroce's affidavit, Mrs. Rubera was identified as the grandmother of defendant Michael Chiarizio who resides in an adjoining building. The factual material establishing probable cause for the authorization was largely the fruit of an earlier authorized wiretap on the telephone of one Joseph Telesca, not a defendant in this case, during February 1973. That wiretap revealed the existence of a betting relationship between Telesca and the defendant Chiarizio which the government had reason to believe was of a wide-reaching nature. The Chiarizio wiretap authorized on March 22, 1973 was designed to uncover the full dimensions of that gambling operation.

The wiretap was authorized for a period of fifteen days with an interim report on its progress to be made to the court after the fifth day. Such a report was submitted and the wiretap interception was terminated on April 2, 1973, ten days after it had begun.

The second series of wiretaps involved in this case was authorized on May 8, 1973. Again the court authorized the use of a pen register device on the "tappee's" telephone. The authorized wiretaps were on the telephones of defendants Schaefer and DeSena. Agent Santacroce's affidavit in support of the application for wiretap authorization cited the results of the Chiarizio tap and contained corroborating information from a confidential source regarding defendant Schaefer's involvement in gambling activities. These wiretap interceptions began on May 9, 1973 and terminated on May 14, 1973.

## A. Constitutionality of Title III

The defendants first launch a broadside attack upon the constitutionality of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, the statute pursuant to which the wiretaps in this case were authorized. Although perhaps not dealing with every specific argument raised by the defendants here, the Second Circuit in United States v. Tortorello, 480 F.2d 764 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) broadly held:

"While the Act permits electronic surveillance wider in scope and longer in duration than that held constitutional in Osborn [v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394], it does not suffer from the infirmities that the Court found fatal to the statute in Berger [v. New York, 388 U.S. 41, 87 S.Ct. 1873 18 L.Ed.2d 1040], and to the surveillance in Katz [v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576]. We decline to add to the constitutionally imposed requirements set forth in those decisions. We therefore hold that Title III is not unconstitutional on its face." Id. at 775.

See United States v. Fino, 478 F.2d 35 (2d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); United States v. James, 161 U.S.App.D.C. 88, 494 F.2d 1007 (1974); United States v. Cafero, 473 F.2d 489 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L. Ed.2d 223 (1974). If the statute is to be held unconstitutional on its face on the basis of any of the arguments not considered in Tortorello, the Second Circuit, not this court, is the proper body to do so. United States v. Romanello, supra.

## B. Compliance with § 2518(1)(b)(iv)

The defendants' most serious challenge, and one to which two days of evidentiary hearings were devoted, was the failure of the government to name defendant Sapere in its application to the court as a target of the March 22, 1973 wiretap, which, they argue, was required by the terms of 18 U.S.C. §

2518(1)(b)(iv) (1970).[9] As a corollary, they argue that the government should also have informed the court of a November 1971 application to wiretap the telephone of Sapere as required by 18 U.S.C. § 2518(1)(e) (1970). This second argument requires no separate consideration. As the government concedes, if Sapere should have been named in the March 1973 application, then it follows that the November 1971 wiretap of Sapere should also have been disclosed to the court. The reverse, of course, is equally true.[10]

The statute in question requires the applicant for wiretap authority to provide the court with a "full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including . . . (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv). It is undisputed that Emil Sapere was not mentioned in either the affidavit of prosecutor Coffey or FBI Agent Santacroce, nor did his name appear in the March 22, 1973 order of the court authorizing the Chiarizio tap. It is also undisputed that Sapere's conversations were intercepted during the course of that wiretap. Thus, the issue presented is whether or not the government knew enough about any gambling relationship between Chiarizio and Sap-

9. 18 U.S.C. § 2518(1) (1970) provides:

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

"(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

"(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing proba-

ble cause to believe that additional communications of the same type will occur thereafter;

"(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

"(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."

10. Interestingly, both challenges are joined in by all but one of the defendants, rather than just the defendant Sapere, the individual who it is contended should have been named in the application. In United States v. Curreri, 368 F.Supp. 757 (D.Md.1973), on the other hand, only the defendant in Sapere's position sought to have his wiretapped conversations suppressed. The defendants here implicitly argue that the failure to mention Sapere tainted and vitiated the wiretap in toto. In light of United States v. Giordano, supra in which the court stressed the importance of strict compliance with all elements of the wiretap statute, it would appear that the defendants' position may be tenable. See 18 U.S.C. § 2518(10)(a) (1970); United States v. Bellosi, 163 U.S.App.D.C. 273, 501 F.2d 833, 841–842 (1974). However, since it is concluded infra that the government did comply with the requirements of 18 U.S.C. § 2518(1)(b)(iv), it is not necessary to reach that issue.

ere at the time they applied for wiretap authority to require them to have named Sapere in that application.

The defendants' assertion that Sapere was "known" as a gambling associate of Chiarizio is based upon the following facts. In October 1971 the FBI was investigating the gambling activities of Emil Sapere, his brothers and others in the Hartford area. In aid of that investigation an application was submitted to the court for authority to tap the telephones of Anthony Cianfaglione and Michael Ferro, alleged confederates of the Saperes. Special Agent Richard Ludwig, the agent in charge of that investigation, submitted an affidavit in support of the application. Much of the information contained in that affidavit had been provided to Special Agents Ludwig and Edward Stiles by an informant ("Source 1"), purportedly a close associate of the Saperes. On April 30, 1971, Source 1 informed the agents, *inter alia*, of the following facts as reported in Agent Ludwig's affidavit:

> "G. That numerous 'independent' bookmakers in the Hartford, Connecticut, area have layoff [11] arrangements with the SAPEREs, including MICHAEL CHIARIZIO, who operates from his residence at 1891 Broad Street, Hartford, and RALPH SANZO, who operates from a restaurant known as 'The Place for Steak', 199 Oakwood Avenue, West Hartford, Connecticut." (Footnote not in original).

That information was corroborated through subsequent contacts with Source 1 and was alleged in the affidavit to be accurate through August 5, 1971. That was the only mention of Michael Chiarizio in the twenty-one page affidavit.

Significantly, Chiarizio was not mentioned as a target of that wiretap, nor of a second wiretap which was placed on the telephones of Emil and Dominic Sapere pursuant to a court order of November 11, 1971.

The defendants' case is also built upon the interception of two conversations during the November 1971 wiretap in which the defendants allege that Chiarizio exchanged gambling information with Sapere. During the course of that wiretap, the pen register device registered that Sapere made several attempts to call a number which the FBI later learned through the telephone company was that of Edwina Dawidowicz, known to Agent Ludwig as Chiarizio's common-law wife. Two of those calls were completed, intercepted and transcripts ultimately made of the conversations which took place between Sapere and a male who identified himself as Matt or Mike, as noted in the transcript. The two conversations in question were brief, but seem to have involved a betting transaction, although they were conducted in rather cryptic jargon.[12]

The defendants argue that Matt or Mike was in fact Michael Chiarizio and that the government knew it at the time by virtue of their knowledge of the relationship between Chiarizio and Ms. Dawidowicz, the person in whose name the number called was registered. The government denies having made such an identification. This denial is credible in light of the fact that these brief conversations were only two of over one thousand intercepted at the time, the speaker's identification of himself was indistinct, and the FBI did not learn that the number called was that of Ms. Dawidow-

11. "When a betting person has more money bet on a participant than he wishes, he transfers all or a part of the bet to someone else. This is called laying off." United States v. Bobo, 477 F.2d 974, 990, n. 9 (4th Cir. 1973).

12. At the hearing on this motion, Agent Ludwig was rather hesitant to characterize either of these conversations as being gam-

bling-related. However, he did admit that they could reasonably be interpreted as such. Because it really makes no difference to the ultimate disposition of this claim, it will be assumed that the conversations were gambling-related and that the agent monitoring the telephone calls recognized them as such at the time.

icz until several days after the interception had taken place.

Even if the government's disclaimers on this point were to be discredited, it is clear that the investigators did not consider these calls to be of very great importance. They were attempting to identify those persons with whom the targets of the wiretap were carrying on significant gambling operations. The first of the two intercepted conversations itself indicated the limited nature of the relationship between Sapere and Chiarizio (assuming that he was the other participant in the conversation) at that time. Source 1 had informed Agents Ludwig and Stiles of a "lay-off" relationship between Chiarizio and Sapere, yet the first thing Sapere said to Chiarizio upon reaching him on the telephone was: "Gez, you don't call me no more." Transcript of Intercepted Conversation of Nov. 15, 1971, 7:02 P.M., log 4 at 43. Even if the agents had been looking for evidence of a significant gambling relationship between these two men, that statement would certainly not have encouraged them.

Indeed, upon completion of the wiretap interceptions, the government in December 1971 applied for a warrant to search the homes of individuals who had been the original targets of the investigation and also a number of others whose involvement in the gambling operations was first uncovered by the wiretaps of October and November 1971. Significantly, no warrant was sought for the search of Chiarizio's home. Nor was he among those ultimately indicted as a result of these wiretaps. United States v. Sapere, Crim. H–263 (D.Conn.).

The defendants also point to one other incident to demonstrate the government's alleged knowledge of a gambling relationship between Sapere and Chiarizio. In May 1972 Agents Ludwig and Santacroce approached Chiarizio at a local restaurant and attempted to secure his agreement to testify against Sapere and others in the case being prepared for presentation to the grand jury. Neither agent, at the evidentiary hearing, was able to recall precisely the contents of that conversation. Basically, however, they attempted to "con" Chiarizio by suggesting that he might be indicted if he did not cooperate with the government.

The defendants try to use this incident to demonstrate that the FBI was well aware of an ongoing relationship between these two men, and, in fact, had hard evidence to substantiate that link. Such an inference, however, is not supported by the record. First, Agent Ludwig testified that Chiarizio was only one of approximately thirty individuals whose testimony the government sought to "induce." Secondly, Chiarizio refused to testify and yet suffered no adverse consequences. It would be reasonable to assume that if the government actually had such hard evidence of a link between them it would have indicted Chiarizio along with the others whose involvement with the Saperes was uncovered in the course of the October and November 1971 wiretaps.

This recitation really presents all the facts upon which the defendants' case is predicated. At the evidentiary hearing, they attempted through various witnesses to prove that Agent Santacroce must have had more information regarding a gambling relationship between Sapere and Chiarizio on March 22, 1973, the date on which he submitted his affidavit in support of the application for the Chiarizio wiretap, than he was willing to admit. Continually, however, they were rebuffed in their efforts by flat denials from various federal and state law enforcement agents whom they had called as witnesses. Thus, for example, Agent Stiles, the person who maintained the closest contact with Source 1, testified that he had no recollection of any information of a lay-off relationship between Chiarizio and Sapere provided by Source 1 after December 1971.[13] The defendants were also unable to establish

---

13. The defendants attempted, but were unable, to secure the testimony at the evidentiary hearing of a Mr. Herman Levitan whom they believe to be Source 1. They

the existence of a cross-reference system in the FBI files which would directly link Chiarizio to Sapere. The defendants were just unable to prove that Agent Santacroce in March 1973 was conscious of the relationship in question. In fact, he emphatically stated:

> "In March of 1973 I had no reason, no knowledge of any connection between Chiarizio and Sapere when I prepared that affidavit." Transcript of Hearing, September 10, 1974 at 167.

■ It is quite clear when measured against the legal standard to be applied in such cases, that the defendants have not established a factual record entitling them to the suppression of the wiretap evidence. In United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) the Supreme Court established the standard for testing the sufficiency of a wiretap application under § 2518(1)(b)(iv). In that case the government had secured authorization to " 'intercept wire communications of Irving Kahn and others as yet unknown.' " 415 U.S. at 147, 94 S.Ct. at 980. In the course of the wiretap, however, they intercepted a conversation between Minnie Kahn, Irving's wife, and a known gambling figure with whom she discussed various kinds of gambling information. The evidence secured by the wiretap led to the indictment of both Irving and Minnie Kahn for gambling violations under 18 U.S.C. § 1952 (1970).

The district court granted Minnie Kahn's motion to suppress the conversations in which she had participated.[14] The Seventh Circuit affirmed the trial court's ruling, holding that the term "others as yet unknown" could not include persons whom the government through careful investigation could have discovered were likely to be using the wiretapped facilities for illegal purposes. United States v. Kahn, 471 F.2d 191 (7 Cir. 1972), rev'd, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

■ The Supreme Court, however, took a much narrower view of the burden which § 2518(1)(b)(iv) imposes upon law enforcement officials. It rejected the Seventh Circuit's standard of "discoverability," and chose instead to read the requirements of the statute literally:

> "We conclude, therefore, that Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought. Since it is undisputed that the Government had no reason to suspect Minnie Kahn of complicity in the gambling business before the wire interceptions here began, it follows that under the statute she was among the class of persons 'as yet unknown' covered by Judge Campbell's order." 415 U.S. at 155, 94 S.Ct. at 984.

The defendants argue that *Kahn* is distinguishable from the instant case. Unlike Minnie Kahn whose criminal use of the wiretapped facilities was not known at the time of the application, Emil Sapere, the defendants assert, was a gambling figure whose ties to Michael Chiarizio were sufficiently well known to the government to require naming him in the application for wiretap authorization.

The defendants' argument is implicitly two-pronged and in the alternative. First, they suggest that Agent Santacroce was less than truthful when he asserted, as quoted above, that on March 22, 1973 he had no knowledge of any

---

suggest that Mr. Levitan could have provided relevant testimony in support of their motion, but were unable to make any definite showing as to what his testimony would be. They were clearly hoping to elicit testimony that Source 1 continued to provide information to the FBI throughout 1972 and 1973

of a "lay-off" relationship between Chiarizio and Sapere. In light of the testimony adduced at the hearing, there is no basis for believing that even if Mr. Levitan were Source 1 that his testimony would satisfy their expectations.

14. *See* note 10, *supra*.

connection between Sapere and Chiarizio and thus lacked probable cause to believe that Sapere was violating 18 U.S.C. § 1955 in conjunction with Chiarizio or that his communications would be intercepted over Mrs. Rubera's telephone. They are thus essentially asserting that Santacroce made a willful misrepresentation to the court in his March 22, 1973 affidavit. This is the necessary implication of such a claim because under § 2518(1)(b)(iv) the affiant has an affirmative obligation to report to the court the names of all persons who fall within the provisions of that section. Thus, an application for wiretap authority is a representation to the court that the government does not have probable cause to believe that any persons other than those named in the application are committing the offense and are likely to be intercepted in the course of the proposed wiretap.

The burden of demonstrating such misrepresentation is heavy. *Cf.* United States v. Marihart, 492 F.2d 897 (8th Cir. 1974); United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973) (en banc). The defendants have come nowhere near satisfying that burden. At the very most they have proven that Santacroce had read Agent Ludwig's affidavit in support of the 1971 series of wiretaps at or near the time it was drafted. In addition, Santacroce in May 1972 joined Ludwig in attempting to "con" Chiarizio into testifying against Sapere. However, as discussed above, that incident by itself does not prove that either Ludwig or Santacroce at that time had probable cause to believe that a *gambling relationship* existed between the two men. Finally, Santacroce had every reason to disclose in his affidavit the involvement of as many persons as possible in the gambling operation. This is because the investigation was focusing upon violations of 18 U.S.C. § 1955 which requires the involvement of five or more persons.[15] Indeed, Santacroce's good faith is demonstrated by the fact that in his affidavit in support of the second series of wiretaps in May 1973, he did name Emil Sapere, whose conversations had by then been intercepted in the Chiarizio tap, and disclosed to the court the prior application for authority to tap Sapere's telephone of November 1971 as required by 18 U.S.C. § 2518(1)(e).

Thus, this court finds highly credible Santacroce's assertion that as of March 22, 1973 he knew nothing of the Sapere-Chiarizio connection, or at the very least did not have probable cause to believe that Sapere's communications would be intercepted during the proposed Chiarizio tap.

Alternatively, the defendants suggest that even if Agent Santacroce did not personally have such knowledge, he was obliged to investigate the FBI files and inquire of other agents to determine if they knew of other persons whose conversations were likely to be intercepted during the proposed tap. This is a difficult issue, but one which I need not reach.[16] Even assuming that he had

15. See note 1, *supra.*

16. The statute itself provides that the application shall include "a full and complete statement of the facts and circumstances relied upon by the *applicant,* to justify *his* belief that an order should be issued, including . . . (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv) (emphasis added). Focusing upon the underscored portions, it would seem that the statute only imposes an obligation upon the affiant to disclose to the court the names of the persons whom *he* personally has probable cause to believe are committing the offense and whose communications are to be intercepted. Although it may be good investigative technique to fully explore the information contained in FBI files or in the minds of other agents, it does not appear to be literally mandated by the statute. Moreover, such an interpretation would effectively engraft upon the statute a form of "discoverability" requirement similar to the one rejected in *Kahn.*

On the other hand, in *Kahn,* where this problem was not presented, the Court did not focus upon the language emphasized above but spoke instead in terms of the obligation which § 2518(1)(b)(iv) imposes upon the *government,* as opposed to the individual applicant. For example, the Court said:

"This statutory language would plainly seem to require the naming of a specific person in the wiretap application only

such an obligation, the defendants have failed to demonstrate that the law enforcement officials collectively possessed information that would provide them with probable cause to believe that Sapere was committing the offense under investigation in March 1973 or that his communications would be intercepted in the course of the proposed wiretap.

Any information which the government possessed regarding a Chiarizio-Sapere link was approximately fifteen months old by March 1973. Even when fresh, that information was weak and had not even provided grounds for in-

dicting Chiarizio with the Saperes. In view of the passage of a considerable period of time, and the indictment of Sapere, the stale information could not establish probable cause.

■ As noted by the Sixth Circuit recently: "The term 'as yet unknown' may properly be applied to persons whose identity is known, but who the government has no probable cause to believe are involved in illegal use of communication facilities." United States v. Martinez, 498 F.2d 464, 468 (1974). *See* United States v. Curreri, *supra.*[17] That statement is certainly applicable

when *law enforcement officials* believe that such an individual is actually committing one of the offenses specified in 18 U.S.C. § 2516. Since it is undisputed here that Minnie Kahn was not *known to the Government* to be engaging in gambling activities at the time the interception order was sought, the failure to include her name in the application would thus seem to comport with the literal language of § 2518(1)(b)(iv)." 415 U.S. at 152, 94 S. Ct. at 982 (emphasis added).

This reading of the statute would seem to complement the requirements of § 2518(1)(c) which requires the applicant to demonstrate that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Unless an applicant had thoroughly investigated his case by talking to other agents and combing the FBI files, it is difficult to understand how he could adequately make such a representation to a court. From this viewpoint, the proscription of the "discoverability" standard in *Kahn* would apply only to evidence not already possessed by the government, as opposed to that contained in the government files or in the minds of other agents.

In a related context, Judge Friendly (formerly Chief Judge) held that in making a warrantless arrest, the particular arresting officers need not be personally aware of all the facts and circumstances which contribute to a finding of probable cause:

"'[I]n a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest.' Williams v. United States, 113 U.S.App.D.C. 371, 308 F.2d 326, 327 (1962); see United States v. Bianco, 189 F.2d 716 (3 Cir. 1951);

Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966) (Burger, J.), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967); United States v. Pitt, 382 F.2d 322 (4 Cir. 1967)."
United States v. Canieso, 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972); *cf.* United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Whether law enforcement officials can benefit from this imputation in the warrantless arrest context, and yet not be charged with it under § 2518(1)(b)(iv), adds to the nicety of this issue. *See also* Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

17. In *Curreri* the court rejected an argument that the government had not complied with § 2518(1)(b)(iv) based on a factual record much stronger than that presented here. Decided prior to *Kahn,* but not necessarily modified by it, the case articulates a standard that defendants must make "a strong and clear, and not questionable, showing [that the government had] probable cause" to believe that an unnamed individual was (1) involved in the violation of the crime under investigation *and* (2) would use "the telephones of his co-conspirators in furtherance of that illegal activity." 368 F.Supp. at 762. In that case the court found that the defendants had made such a showing with regard to the first prong of the test, but had failed to satisfy their burden on the second prong. It held that the second requirement could not be satisfied merely by an inference arising from the fact of demonstrated criminal involvement with the targets of the wiretap. I need not adopt that rather strict standard to support a ruling against the defendants in this case.

here where the government, although generally aware of Sapere's past gambling activities, did not have probable cause to believe either that a gambling relationship existed between Chiarizio and Sapere or *a fortiori* that Sapere's communications were likely to be intercepted during the Chiarizio tap. The government was not derelict in failing to name Sapere in its March 22 application for wiretap authorization.

### C. Compliance with § 2518(1)(e)

The defendants further argue that the government had an affirmative obligation under 18 U.S.C. § 2518(1)(e) [18] to disclose to the court the fact the conversations in which Michael Chiarizio was involved had been intercepted in the course of the November 1971 wiretaps on Emil Sapere's telephone. The government, as noted earlier, denies that it was aware that the "Matt" or "Mike" who participated in those conversations was Chiarizio.

 Assuming *arguendo* that the government knew Chiarizio to be the other party to those conversations, it is quite clear that § 2518(1)(e) does not require disclosure of all conversations intercepted during the course of prior interceptions, but rather only facts regarding "previous *applications* known to the individual authorizing and making the application."[19] (Emphasis added.) This point was well discussed and the rationale for the distinction between applications and interceptions was articulated in United States v. Bellosi, *supra*, a case in which the United States Court of Appeals for the District of Columbia strictly interpreted the requirements of § 2518(1)(e) and ordered the suppression of the wiretap evidence involved in that prosecution. The court stated:

"Congress may have required disclosure of all previous *applications*, instead of all prior *interceptions*, to avoid unduly burdening the Government and to avoid an ambiguity which inheres in the latter word and which is not clearly resolved by its use elsewhere in the statute. *Wire interceptions* could refer to continuing wiretaps on particular telephones for particular periods of time; however, the term could also refer to individual intercepted telephone conversations. If the word *interception* had been used in § 2518(1)(e) and if it were given the latter interpretation, the Government would have had the substantial burden of informing the judge from whom an authorization was sought of each individual conversation which had been previously intercepted using the same facilities or places or involving the same persons; for example, there were apparently several hundred conversations intercepted by the Jet Liquor Store wiretap. Such disclosure in many cases is unnecessary. Given the judge's supplemental inquiry power under § 2518(2), in cases where the judge finds that additional information concerning prior applications is needed to act on the pending one, he can order the Government to produce it." 501 F.2d at 839, n. 13 (emphasis original).

There is no merit in this argument of the defendants.

### D. Compliance with § 2518(1)(c)

 The defendants finally argue that the Chiarizio tap of March 22, 1973 was unnecessary because the government had already obtained sufficient evidence of the gambling operations under investigation from the February 1973 wire-

---

18. *See* note 9, *supra*.

19. Of course, the same problem arises with regard to this section as discussed in note 16, *supra*, concerning § 2518(1)(b)(iv) : whether the individual making the application must inform himself of all information on file with the FBI. *Cf.* United States v. O'Neill, 497 F.2d 1020 (6th Cir. 1974) in which the court held that federal investigative agents had no obligation to make inquiry regarding prior applications by state agents in state courts.

tap of the telephone of Joseph Telesca. Thus, they claim, the Chiarizio tap violated the intent and spirit of Title III, one of whose goals is the minimization of the use of wiretapping. The letter of the statute was allegedly violated by the government's failure to provide the court with "a full and complete statement as to whether or not other investigative procedures have been tried and failed . . . ." 18 U.S.C. § 2518(1)(c). That provision could only have been satisfied in this case, they assert, by providing the court with a fully detailed report of the results of the Telesca tap, so that the court could then make an independent determination of the need for the proposed Chiarizio tap.

There is little merit in this claim. A reading of Agent Santacroce's affidavit reveals a reasonably detailed account of the evidence obtained from the Telesca tap of Michael Chiarizio's gambling activities. The affidavit contains the verbatim transcripts of several conversations between Chiarizio and Telesca which illustrate that Chiarizio was taking lay-off bets from Telesca and was supplying him with "sports line" information. There was no apparent effort made to withhold from the court the nature of the evidence derived from the Telesca tap. The government's application and affidavits amply complied with the requirements of § 2518(1)(c). If the court had wanted further information before authorizing the tap, it could have "require[d] the applicant to furnish additional testimony or documentary evidence in support of the application." 18 U.S.C. § 2518(2). This court felt at the time and still believes that such additional information was unnecessary.

■ Of course, a finding of the government's compliance with § 2518(1)(c) does not completely dispose of the defendants' contention. They also argue that the court acted improperly in authorizing the Chiarizio wiretap because it was unnecessary in light of the evidence secured from the Telesca tap.

Agent Santacroce stated in his March 22 affidavit:

"This application for the purposes of interception of wire communications is being submitted to fully determine the extent of the gambling operation that was uncovered during the wire communications intercepted over telephone number 203–754–3506 being utilized by Joseph Telesca." Affidavit of Agent Dewey Santacroce, ¶ 23 at 11.

In that affidavit, Santacroce informed the court of evidence suggesting probable cause to believe that Jay Schaefer and Angelo DeSena were involved in gambling activities with Michael Chiarizio and that their conversations would probably be intercepted during the course of the proposed tap. Conversations of neither of these men were intercepted during the Telesca tap, although Telesca unsuccessfully attempted to call DeSena. This court confirms its earlier judgment and holds that the Chiarizio tap was properly authorized, see 18 U.S. C. § 2518(3), to fully expose the extent and nature of the gambling operation under investigation and to provide the government with evidence of the involvement of individuals whose conversations had not been intercepted during the Telesca tap. See United States v. Carubia, 377 F.Supp. 1099, 1103 (E.D.N.Y.1974); cf. United States v. Mainello, 345 F.Supp. 863, 873 (E.D.N.Y.1972); United States v. Focarile, 340 F.Supp. 1033, 1050 (D. Md.1972), aff'd sub nom. United States v. Giordano, 473 F.2d 906 (4 Cir. 1973), aff'd, 416 U.S. 505, 94 S.Ct. 1820, 40 L. Ed.2d 341 (1974).

E. *Defendant Sapere's Individual Claims.*

Defendant Sapere raises several challenges to the wiretap, applicable only to him. He first argues that the interception procedure violated his fourth amendment rights in that he was not named in the application and court order dated March 22, 1973. That rendered the court order, he argues, a general warrant as to him and thus all intercept-

ed conversations in which he took part must be suppressed.

■ The Second Circuit in United States v. Tortorello, *supra,* considered the substance of this argument and rejected it. In that case the defendant had been named with others in the court order, but probable cause had not been established as to him. In response to the argument that wiretapped evidence could only be used against those for whom probable cause had originally been established, the court said:

> "In our view the government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation. Clearly there was probable cause to intercept Mace's conversations. Tortorello does not contend otherwise. The government therefore was entitled to intercept the incriminating statements of Tortorello where Mace was involved in the conversations and to use such statements to support an application for electronic surveillance of Tortorello." 480 F.2d at 775.

The reach of this holding extends as well to the use of wiretap evidence *at trial* against those who are not named in the court order. *See* United States v. Cox, *supra,* 462 F.2d at 1303–1304; United States v. Schebergen, 353 F. Supp. 932, 935–936 (E.D.Mich.1973); United States v. King, 335 F.Supp. 523, 539 (S.D.Cal.1971), modified on other grounds, 478 F.2d 494 (9th Cir.), cert. denied, 414 U.S. 846, 94 S.Ct. 111, 38 L. Ed.2d 94 (1973); United States v. Perillo, 333 F.Supp. 914, 920–921 (D.Del. 1971); United States v. Sklaroff, 323 F.Supp. 296, 325 (S.D.Fla.1971).

Furthermore, this conclusion is virtually compelled by United States v. Kahn, *supra.* In a footnote the Court discussed the very issue raised by the defendant Sapere. It concluded that, as in the case of an "analogous conventional search and seizure," the failure of a warrant to name the person whose conversations or possessions are ultimately seized does not render it an unconstitutional "general warrant." 415 U.S. at 155, n. 15, 94 S.Ct. 977.

■ Defendant Sapere also alleges that the use of the intercepted conversations would violate his sixth amendment rights under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), as he was under indictment at the time of the interception. This claim is clearly frivolous in light of the United States v. Poeta, 455 F.2d 117 (2d Cir.), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), a case which the defendant oddly cites in his brief in support of his claim. The Court held:

> "Where criminal activities are continuing, as they were here, it is the duty of the government to attempt to secure evidence thereof regardless of whether any indictment has been returned against any participant in the continuing activities. United States v. Edwards, 366 F.2d 853, 873 (2d Cir. 1966)." *Id.* at 122.

The evidence at issue in *Poeta* was obtained by means of a wiretap and held admissible. Defendant Sapere cannot use the existence of an indictment as a shield to protect himself from the otherwise legal investigation of his subsequent involvement in illegal activities.

The defendants, in their respective motions, raised several other issues which they apparently did not find sufficiently meritorious to argue in their briefs. This was good judgment.

Accordingly, the defendants' motions to dismiss the indictment and to suppress evidence are denied.

So ordered.